Filed 10/2/13  P. v. Sotelo CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>MARTIN SOTELO,<br><br>　　　　Defendant and Appellant. | B233791<br><br>(Los Angeles County<br>Super. Ct. No. LA060882) |


APPEAL from a judgment of the Superior Court of Los Angeles County, Martin L. Herscovitz, Judge.  Modified and, as modified, affirmed with directions.

Valorie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Martin Sotelo appeals from the judgment entered following his convictions by jury on count 1 – first degree murder (Pen. Code, § 187) with a principal personally and intentionally discharging a firearm causing death (Pen. Code, § 12022.53, subds. (d) & (e)(1)), and with special circumstances he committed the murder because of the victim's race (Pen. Code, § 190.2, subd. (a)(16)) and by discharging a firearm from a motor vehicle (Pen. Code, § 190.2, subd. (a)(21)), count 2 – evading an officer with willful disregard (Veh. Code, § 2800.2, subd. (a)), and count 3 – attempted second degree robbery (Pen. Code, §§ 664, 211)[1] with a principal personally using a firearm (Pen. Code, § 12022.53, subds. (b) & (e)(1)), with, as to counts 2 and 3, a principal personally armed with a firearm (Pen. Code, § 12022, subd. (a)(1)) and, as to each of counts 1 through 3, a finding he committed the offense for the benefit of, at the direction of, and in association with, a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)).  The court sentenced appellant to prison for life without the possibility of parole, plus 42 years to life.  We modify the judgment and, as modified, affirm it with directions.

## FACTUAL SUMMARY

1. *People's Evidence*.

    a. *The Attempted Second Degree Robbery of Belmonte (Count 3)*.

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence, the sufficiency of which as to the attempted robbery is undisputed, established that about 8:00 p.m. on December 22, 2008, appellant was driving a car containing Richard Bordelon, Kevin Rodriguez, and Deborah Blanco. Appellant drove up to Danielle Belmonte near Lurline and Strathern in Canoga Park.

---

[1]    In the amended information, count 1 was the attempted second degree robbery and the murder was count 4.  During trial, the court renumbered counts with the result the verdicts reflect count 1 was the murder and count 3 was the attempted second degree robbery.  Count 2 remained the same.  We use the numbering reflected in the verdicts since they reflect appellant's convictions.  As discussed below, appellant committed the attempted second degree robbery (count 3), followed by the murder (count 1), followed by the evasion offense (count 2).

2

Appellant and Bordelon, the latter of whom personally used a gun, unsuccessfully tried to rob Belmonte (count 3). In particular, Bordelon, while still in the car, pointed the gun at Belmonte. Bordelon exited the car and pulled Belmonte's purse and hair. Belmonte screamed, Bordelon reentered the car without her property, and appellant drove away. We will present below additional facts concerning this offense.

b. *The Shamp Murder and the Evasion Offense (Counts 1 & 2).*

(1) *Samuel Mason's Testimony and Forensic Evidence.*

Samuel Mason testified that on December 22, 2008, Mason and James Shamp worked at Canoga Park Bowl, a bowling alley. Shamp was an African-American. Shortly after 8:00 p.m., Mason saw Shamp walk towards dumpsters outside the bowling alley to take out the trash.

Mason then heard three gunshots and, within seconds, heard Shamp say, " 'What the hell?' " Shamp walked a few steps then fell, mortally wounded (count 1). The gunshots came from the same area where Shamp had fallen. Mason saw a vehicle in that same area make a U-turn and speed away onto Vanowen.

Shamp's autopsy revealed he had been shot once. The deputy medical examiner who performed the autopsy testified the bullet "entered the left chest" of Shamp and the bullet's trajectory was consistent with a shot fired horizontally at Shamp while he was bending. The bullet perforated Shamp's heart. Police recovered two .25-caliber casings from the shooting scene.

(2) *Police Testimony.*

Los Angeles Police Detective Raymond Diaz testified that about 7:57 p.m. on December 22, 2008, Diaz and his partner, Los Angeles Police Officer Eloy Navarro, were on patrol in Canoga Park when Diaz heard a call about an attempted robbery at Lurline and Strathern involving a described car. About five minutes later, Diaz, who was less than a mile from the scene of the attempted robbery of Belmonte, heard a call about a shooting involving a described car. Diaz, a gang expert, believed both described cars might have been the same car. Moreover, in light of the short time between the calls and

3

the fact both crimes occurred in Canoga Park Alabama gang (CPA) territory, Diaz believed the crimes were probably CPA missions.

At DeSoto and Saticoy, Diaz saw a car that possibly matched the described cars. He followed it and a pursuit ensued (count 2). Diaz saw Bordelon, a CPA member, in the front passenger seat. Diaz recognized him from previous contacts. The pursuit continued down several streets and ended when the car crashed on Sherman Way near Eton, in front of the Vallarta Market. Two males fled from the car. Diaz testified Bordelon was one of the two males and Navarro testified appellant was the other. Video surveillance depicted appellant removing his shirt in the market and putting it on a shelf.

(3) *Rodriguez's Statement and Testimony*.

Police arrested Rodriguez in January 2009, and he told police the following. Rodriguez was in the car with appellant and Bordelon during the Shamp shooting. Appellant was the driver and Bordelon was the front passenger. Rodriguez heard appellant utter "the 'n' word." During a later interview, Rodriguez said Bordelon was the shooter, and Bordelon, not appellant, uttered the racial slur. Rodriguez, when he was in the car, knew about a "mission."

At trial, Rodriguez testified as follows.[2] On December 22, 2008, Rodriguez was a CPA member. Bordelon was like a brother to Rodriguez. They used a racial epithet to refer to African-Americans, and talked about robbing and shooting them. Rodriguez and Bordelon jointly committed street robberies in Canoga Park.

Between September and November 2008, Rodriguez and Bordelon committed a residential burglary and traded the loot for a .25-caliber gun. They shared the gun to rob and shoot people in Canoga Park. Rodriguez attended CPA meetings and the last was in November 2008. The members discussed a murder at the meeting. They were angry because African-Americans had killed one of their "homeboys." Gang members ordered

---

[2] Rodriguez testified pursuant to a leniency agreement permitting him to plead guilty to an offense arising from the killing of Shamp on the condition, inter alia, that Rodriguez testified truthfully at appellant's trial.

4

that if members saw an African-American male, the members were to do whatever they could to him, such as beating, robbing, or shooting him. Rodriguez left the meeting and put in work for the gang. Putting in work or doing a mission for the gang meant robbing, shooting, or killing people.

On the morning of December 22, 2008, Rodriguez was with Bordelon at an apartment complex where CPA members congregated. Appellant called Bordelon by phone and asked if Bordelon wanted " 'to hang around or something.' " During the conversation, Bordelon talked about African-Americans. After the call, Rodriguez or Bordelon gave their gun to Blanco and went outside to wait for appellant. Rodriguez knew appellant as Youngster and had associated with him on a previous occasion.

About ten minutes after Rodriguez and Bordelon went outside, appellant arrived and drove Rodriguez and Bordelon to another apartment complex in Canoga Park. They used drugs at someone's apartment until about 5:00 or 6:00 p.m. Appellant, and later Bordelon, left. Rodriguez later went outside and appellant drove up in a car. Bordelon sat in the passenger seat and Rodriguez sat in the back. Bordelon said, " 'Let's go pick up [Blanco], get the gun, and see if we can come up on anybody,' " that is, rob people.

The men went to an apartment complex on Roscoe to get a gun from Blanco. After appellant obtained the gun from Blanco, he and Bordelon argued about who should have it but Bordelon ended up with it. Rodriguez testified, "Before we got in the car, the discussion was . . . we were talking; and we were going on a mission to . . . rob people or whatever you can do."

The group first tried to rob a woman, later identified as Belmonte. Appellant was driving when he saw Belmonte. Appellant said, " 'Look at that lady over there.' " Bordelon told him to make a U-turn and appellant complied. Appellant drove up to Belmonte and Bordelon pointed a gun at her. Bordelon exited the car and attempted to rob her.[3]

---

[3] During Rodriguez's testimony concerning the attempted robbery of Belmonte, the prosecutor asked Rodriguez how well he remembered what happened on December 22,

Later, Bordelon said they should " 'go to the bowling alley and catch somebody slipping,' " meaning catch someone off guard. Rodriguez testified it was easier to rob or shoot someone when they were off guard.

Appellant drove into the driveway of the bowling alley. Bordelon said, " 'Look at that [racial epithet] over there' " and was rolling down his window. Bordelon told appellant, " 'As soon as I'm done, book it.' " Appellant stopped the car, Bordelon pointed the gun out the window, leveled the gun with the window, and fired three to four shots at the man, later identified as Shamp.[4] The gun was the one that had been received in trade for burglary loot. After the last shot, appellant said, " 'Let's go' " and " 'Hurry up,' " or something similar. Shamp was holding his chest. Appellant acted as the getaway driver.

Bordelon later told everyone not to say anything, if anything happened, he would take the blame, and they were going to get away with it. Bordelon discussed giving the gun to a CPA member and was telling the group how to get to the member's house. A police pursuit later began. Once appellant made three or four turns at the beginning of the pursuit, Bordelon threw the gun out the window.

c. *Gang Evidence*.

Diaz, a gang expert, testified as follows. CPA consisted almost exclusively of Mexicans and El Salvadorians; there were no African-American members. The

---

2008. Rodriguez replied there were some parts he could not remember because he "was on [methamphetamine]." He also testified his memory was better when he was arrested and the passage of time caused him a little difficulty in remembering all the details.

[4] Rodriguez testified appellant stopped the car "at least a hundred feet away, if I'm right," and Bordelon pointed the gun outside the car and fired shots. Rodriguez pointed to a location in the courtroom that corresponded to the distance between Rodriguez and Shamp when Rodriguez drove into the driveway of the bowling alley, and the court stated the distance was "probably . . . 25 feet." Both Mason and Rodriguez demonstrated distances using an aerial photograph (People's exhibit No. 1) of the bowling alley that was admitted into evidence.

Belmonte and Shamp crimes occurred in CPA territory. CPA's primary activities included murder, attempted murder, and robbery.

A CPA member could elevate his or her status by "putting in work" or committing crimes for the gang. When multiple gang members jointly committed a crime, it was a mission. A mission involved committing a crime for the gang to show loyalty to it, and the crimes could range from vandalism to murder.

CPA's primary rival was the Original Valley Gangsters (OVG), an African-American gang. CPA harbored racial animosity toward African-Americans. In 2006, CPA began a campaign of assaulting African-Americans in Canoga Park. Most of the victims were attacked during drive-by shootings and were not gang members. Victims were targeted based on race. CPA graffiti reflected the gang's hostility towards African-Americans and the graffiti, using racial epithets, indicated CPA members killed African-Americans.

Hispanic gangs south of Bakersfield were called Surenos, or South Siders (hereafter, Sureno(s)). The cultures and ideologies of CPA in particular, and Sureno gangs generally, were essentially the same. Sureno gangs drew "a racial line" between Hispanics and Mexicans, and African-Americans. Diaz knew of no African-Americans who were Surenos. Sureno gang members had tattoos reflecting Mayan or Aztec culture. CPA graffiti reflected the gang was connected with Sureno gangs, and that graffiti included the number 13.

Appellant was once a Sol Trece gang member and known by monikers including Youngster. Sol Trece was mainly a Sun Valley gang.[5] Appellant had tattoos of the Mayan number 13, a "Sur" tattoo that meant South, and tattoos indicating South Sider.

---

[5] During cross-examination, appellant's counsel asked Diaz if Sol Trece was "defunct" as of December 22, 2008. Diaz replied, "Yes. It was removed from our system, as far as gang members being monitored" by the North Hollywood and Foothill divisions. Diaz denied it was fair to say Sol Trece was not "in existence," and instead testified Sol Trece was not "active enough to where they would be a primary monitored gang."

7

Based upon these tattoos, Diaz opined appellant was "down for being a member of a South Sider" or "down for basically any gang that is a South-Sider gang." Appellant also had a tattoo of the sun, representing his connection to Sureno gangs. Bordelon was a CPA member whose moniker was Psycho, and Rodriguez was a new CPA member. Rodriguez had been putting in work for CPA up to and including on December 22, 2008. Blanco was a CPA associate.

In response to hypothetical questions including facts of the attempted robbery of Belmonte and the murder of Shamp, Diaz opined those offenses were committed for the benefit of CPA. In response to a hypothetical question including facts of the evasion offense (count 2), Diaz testified the police pursuit benefited CPA. The eluding of police enhanced gang members' reputations. CPA members who committed a series of crimes such as attempted robbery at gunpoint and the murder of an African-American man, and then eluded police, would be elevated to heroic status within the gang.

2. *Defense Evidence*.

In defense, appellant, who had suffered a felony conviction for assault by means of force likely to produce great bodily injury, testified as follows. Appellant harbored no animosity towards African-Americans. Appellant met Bordelon only a few weeks before the present offenses were committed and was not his friend. Appellant had known Bordelon was a CPA member. They met two or three times to drink and to smoke marijuana. Appellant had met Rodriguez only once before December 22, 2008. Appellant met Blanco independently of Bordelon.

Appellant never had anything to do with CPA. Appellant once associated with the Sol Trece gang but it no longer existed. Appellant was pressured into getting Sureno gang tattoos when he was in prison. Appellant denied knowing Bordelon was going to try to rob Belmonte or shoot Shamp.

After the shooting, appellant drove out onto the street and turned. Bordelon told him to make another turn at a light. Appellant was panicking because Bordelon had fired the gun for no reason. Bordelon told appellant to make additional turns. After appellant

8

made those turns, he saw a police car behind him. The police car later activated its lights and siren. Appellant did not stop because he was paranoid and "knowing this guy next to me, fucking Psycho, just shot an innocent person, I'm thinking, 'If I pull over, fucking, he's going to shoot me.' " Appellant did not testify he was evasively driving because he was on parole. After appellant entered the market, Bordelon was not a threat to him. Nonetheless, appellant failed to surrender at that time to police, in part because, according to appellant, he was on parole.

Andrew Griffith testified one of his parents was an African-American, Griffith grew up with appellant, and Griffith had not known appellant to harbor animosity towards African-Americans.

## ISSUES

Appellant claims (1) there is insufficient evidence supporting his murder conviction (count 1), (2) there is insufficient evidence supporting the true finding as to the race special circumstance, (3) his conviction for the evasion offense (count 2) must be reversed because the trial court erroneously refused to give a duress instruction, (4) there is insufficient evidence supporting the true finding as to the gang allegation pertaining to count 2, (5) the true findings as to the Penal Code section 12022.53 allegations pertaining to count 1 and count 3 (the attempted second degree robbery offense) violate equal protection guarantees, and (6) the trial court imposed an unauthorized sentence as to count 3.

## DISCUSSION

1. *Sufficient Evidence Supported Appellant's Murder Conviction (Count 1).*

Appellant claims there is insufficient evidence he committed murder because there is insufficient evidence he harbored intent to kill. He concedes the evidence established Bordelon was the shooter, appellant was driving the vehicle "at the time Bordelon fired the fatal shots," and there was sufficient evidence Bordelon acted with intent to kill. However, appellant argues appellant was not an aider and abettor simply because there

was insufficient evidence he "shared the murderous intent of Bordelon." We reject appellant's claim.

A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) Factors relevant to a determination of whether a defendant was an accomplice include presence at the scene of the crime, companionship, and conduct before and after the offense. (*People v. Singleton* (1987) 196 Cal.App.3d 488, 492.) "[W]hen guilt does not depend on the natural and probable consequences doctrine, . . . the aider and abettor must know and share the murderous intent of the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) When reviewing appellant's sufficiency claim, our power begins and ends with the determination whether there is substantial evidence, contradicted or uncontradicted, to support the judgment. (*People v. Hernandez* (1990) 219 Cal.App.3d 1177, 1181-1182.)

There was substantial evidence as follows. Prior to the present offenses, appellant was driving when Bordelon said, " 'Let's go pick up [Blanco], get the gun, and see if we can come up on anybody,' " that is, rob people. Appellant obtained the gun from Blanco and argued he should have it. Appellant was in the car when Bordelon talked about going on a mission to rob people "or whatever you can do."

Minutes before the Shamp murder, appellant was an accomplice and the getaway driver when Bordelon, using a gun, violently tried to rob Belmonte. Bordelon later indicated they should go to the bowling alley and catch someone off guard. Rodriguez testified it was easier to shoot someone who was off guard. Appellant drove Bordelon to the bowling alley. Bordelon told the car's occupants, including appellant, to look at Shamp, and Bordelon used a racial epithet to refer to Shamp. Bordelon rolled down his window and told appellant, " 'As soon as I'm done, book it.' "

10

According to Rodriguez's testimony, appellant stopped the car, apparently without being told. Shamp was in that area. The following then occurred in appellant's presence as the driver. Bordelon, with murderous intent, fired multiple shots at Shamp in an effort to kill him violently. Bordelon carefully aimed at Shamp, leveling the gun when firing at him. ". . . 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." [Citation.]' " (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1225.) A bullet not only could have inflicted but did inflict a mortal wound upon Shamp.

A bullet struck Shamp in the left side of his chest, i.e., in the area of vital organs; indeed, Bordelon shot Shamp in the heart. Appellant did not leave after the first shot but drove away with Bordelon only after Bordelon finished shooting. Appellant offered no assistance to Shamp, who had fallen mortally wounded. Appellant was driving the car during the later police pursuit, i.e., conduct evidencing consciousness of guilt. After the car crashed, appellant fled on foot and removed his shirt, additional consciousness of guilt evidence.

In part 2 of our Discussion, *infra*, we conclude there was sufficient evidence supporting the special circumstance finding that "The victim was intentionally killed because of his . . . race . . . ." within the meaning of Penal Code section 190.2, subdivision (a)(16). In part 4, *infra*, we conclude there was sufficient evidence the evasion offense was gang-related. We incorporate those discussions here and they further support our conclusion appellant harbored intent to kill when Bordelon shot Shamp. We conclude there was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that appellant was an accomplice to the murder of Shamp, including sufficient evidence appellant shared Bordelon's murderous intent.

2. *Sufficient Evidence Supported the Race Special Circumstance Finding (Count 1).*

The jury found true "the murder of James Shamp was committed by a principal, and that James Shamp was killed intentionally because of his race, within the meaning of

11

Penal Code section 190.2(a)(16)." Appellant claims there was insufficient evidence supporting this finding because there was insufficient evidence race was a substantial factor that motivated appellant's conduct. We reject the claim.

The Penal Code section 190.2, subdivision (a)(16) race special circumstance applies when the defendant is found guilty of first degree murder and "The victim was intentionally killed *because of his . . . race*, . . ." (italics added) within the meaning of that subdivision. "[T]he bias motivation must be a *cause in fact* of the offense, whether or not other causes also exist. [Citation.] When multiple concurrent motives exist, the prohibited bias must be a *substantial factor* in bringing about the crime." (*In re M.S.* (1995) 10 Cal.4th 698, 719, italics added.) Appellant concedes we review the evidence under the deferential substantial evidence test.

There was substantial evidence as follows. Diaz testified CPA consisted of Mexicans and El Salvadorians, but no African-Americans. CPA harbored racial animosity towards African-Americans, and CPA had instituted a campaign of violence against African-Americans in the community. Most victims were attacked in drive-by shootings and were not gang members. (That was the case with Shamp.) Diaz opined the victims were targeted based on their race. CPA frequently committed crimes against African-Americans. CPA graffiti, including racial epithets, indicated members killed African-Americans.

Rodriguez testified as follows. Rodriguez and Bordelon were CPA members who used a racial epithet to refer to African-Americans and spoke about shooting them. Rodriguez attended several CPA meetings and the last was in November 2008. CPA members repeatedly met and the last meeting was in November 2008. They were angry about African-Americans killing one of their "homeboys." A gang member ordered that if members saw a Black male, the members were to do whatever they could to him, including shooting him. Rodriguez left the meeting intending to put in work for the gang, including intending to shoot people.

12

The culture and ideologies of CPA and Sureno gangs were the same. CPA and Sureno gangs shared ideology. CPA graffiti connected that gang with Sureno gangs. Sureno gang members had tattoos reflecting Mayan or Aztec culture. Sureno gangs drew a racial line between, on the one hand, Hispanics and Mexicans and, on the other, African-Americans. Diaz knew no African-Americans connected to a Sureno gang.

Prior to December 22, 2008, appellant was a Sol Trece gang member. On that date, he had Mayan tattoos and other tattoos related to Sureno and South Sider gangs. Diaz opined appellant was "down for being a member of a South Sider" or "down for basically any gang that is a South Sider gang." CPA was such a gang.

On the morning of December 22, 2008, appellant called Bordelon, asked if Bordelon wanted to hang around, and Bordelon talked about African-Americans. When appellant and Bordelon were at the scene of the Shamp shooting, Bordelon uttered a racial slur in appellant's presence. When appellant drove into the driveway, Bordelon pointed at a man – Shamp, an African-American – and said " 'Look at that [racial epithet] over there.' " Bordelon subsequently shot Shamp. Appellant testified Bordelon shot Shamp within two or three seconds after Bordelon made the racial slur.

Diaz, a gang expert, believed the murder of Shamp was a CPA mission. In part 4 of our Discussion, *infra*, we conclude there was sufficient evidence the evasion offense was gang-related. We incorporate that discussion here. In light of all of the above evidence, we conclude there was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that appellant intentionally killed Shamp "because of his . . . race" within the meaning of Penal Code section 190.2, subdivision (a)(16).

3. *The Trial Court Did Not Reversibly Err by Refusing to Instruct on Duress as to the Evasion Offense (Count 2).*

During discussions concerning jury instructions, appellant asked the trial court to use CALCRIM No. 3402 to instruct the jury on duress as a defense to the evasion offense (count 2). That instruction indicated a defendant was not guilty of a crime if the defendant acted under duress, i.e., if, because of threat or menace, the defendant

13

reasonably believed the defendant's life would be in danger if the defendant refused a demand or request to commit a crime.

The court refused to give the instruction, commenting the unrebutted testimony was that the gun was thrown out of the car early during the chase. The court concluded there was no evidence of an express or implied threat, and stated, "Telling someone to drive right after committing a murder or when the police light up the car and sound the siren is not duress of immediate death, especially when the instrument of death has been thrown out of the car."

Appellant claims the trial court's refusal to instruct on duress was prejudicial error as to count 2 because there was substantial evidence to support such an instruction. We assume without deciding that appellant's testimony provided substantial evidence of duress. However, even if the trial court erred by failing to instruct on duress, it does not follow we must reverse the judgment as to count 2.

There is no dispute appellant did not act under duress when he aided and abetted Bordelon's violent attempted robbery of Belmonte at gunpoint. Minutes later, Bordelon shot and murdered Shamp. In part 1 of our Discussion, *ante*, we concluded there was sufficient evidence appellant intended to kill Shamp. Indeed, there was sufficient evidence appellant, as an accomplice, committed the first degree murder of Shamp, with appellant as principal in an offense in which a person personally and intentionally discharged a firearm causing death (Pen. Code, § 12022.53, subds. (d) & (e)(1)), with appellant having committed the offense for gang-related reasons (Pen. Code, § 186.22, subd. (b)(1)), and with special circumstances that he committed the murder because of Shamp's race, and by discharging a firearm from a motor vehicle.

Against the backdrop of appellant's commission of the above two serious, violent, and intentional felonies, appellant argues he acted under duress when evading police minutes after the murder. However, there was evidence that, after the murder and shortly after the police pursuit began, the gun was thrown out of the car; therefore, Bordelon could not have threatened appellant with that gun during the subsequent lengthy pursuit.

14

Even assuming Vehicle Code section 2800.2, subdivision (a) is not a continuing offense, and notwithstanding appellant's assertion that appellant's guilt for that offense was established even before the gun was discarded, nothing in that subdivision's language precluded the jury from considering appellant's evasive conduct after the gun was discarded as evidence of lack of duress before the gun was discarded.

The jury heard appellant's testimony relating to duress. Moreover, during jury argument, appellant's counsel in effect commented on duress when he told the jury that appellant testified he did not pull over because "if he pulled over, he was going to be the next target" of Bordelon, given Bordelon's previous actions. Beyond that, during jury argument, appellant's counsel commented, "you should convict [appellant] of the charge of willful evasion of the police. He's guilty of that, and you should convict him of that." Appellant then argued he evaded police because the police would not have believed his innocent explanations of what previously had happened and the fact he evaded police was not dispositive of his state of mind at the time of the attempted robbery and the murder.

The jury's findings that appellant committed attempted robbery involving a firearm, then committed a race-, firearm-, and gang-related first degree murder, militate against a conclusion that, if the court had instructed on duress, the jury would have found appellant acted under duress when evading police minutes after the first degree murder. Any trial court error in failing to instruct on duress as a defense to the evasion offense (count 2) was harmless under any conceivable standard. (Cf. *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Saavedra* (2007) 156 Cal.App.4th 561, 569 (*Saavedra*); *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)[6]

---

[6] In *People v. Salas* (2006) 37 Cal.4th 967 (*Salas*) (cited by *Saavedra*) our Supreme Court stated, "We have not yet determined what test of prejudice applies to the failure to instruct on an affirmative defense" (*Id.* at p. 984) and then concluded the instructional error in *Salas* was harmless even assuming the *Chapman* test applied. (*Salas*, at p. 984.) Because *Salas* evaluated the instructional error in that case for prejudice, we reject appellant's argument that the alleged instructional error in this case was structural error that is reversible per se. (Cf. *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

4. *There Was Sufficient Evidence Supporting the True Findings as to the Gang Allegation as to the Evasion Offense (Count 2).*

Appellant, for purposes of his present claim, does not dispute he attempted to rob Belmonte (count 3), the offense involved a firearm, or, significantly, the offense was gang-related for purposes of Penal Code section 186.22, subdivision (b)(1). Nor does appellant dispute for purposes of his present claim that (1) minutes after committing the attempted robbery, he committed the first degree murder of Shamp (count 1), or (2) the murder was race-, firearm-, and gang-related for purposes of Penal Code section 186.22, subdivision (b)(1). Instead, appellant argues there was insufficient evidence his evasion offense (count 2), i.e., an offense he committed minutes after the murder, was gang-related for purposes of Penal Code section 186.22, subdivision (b)(1). In particular, he argues there was insufficient evidence he committed the evasion offense "with the specific intent to promote, further, or assist in any criminal conduct by gang members" within the meaning of Penal Code section 186.22, subdivision (b)(1).[7] We reject the claim.

The facts (undisputed for purposes of appellant's current claim) that he committed, in a matter of minutes, attempted robbery (count 3), then murder (count 1), each with the above quoted gang-related specific intent, was evidence appellant committed, minutes after the murder, the evasion offense with that same specific intent. Moreover, we recited in our Factual Summary pertinent facts concerning the gang evidence, we discussed gang-related and race-related evidence in part 2 of our Discussion, and we will not repeat those matters here. Diaz testified the police pursuit benefited CPA and the eluding of police enhanced gang members' reputations. Based on the entirety of the evidence, we

---

[7] Penal Code section 186.22, subdivision (b)(1), states, in relevant part, ". . . any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, *with the specific intent to promote, further, or assist in any criminal conduct by gang members,* shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished . . . ." (Italics added.)

16

conclude there was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that the gang allegation as to the evasion offense was true, including sufficient evidence of the requisite specific intent. (Cf. *People v. Leon* (2008) 161 Cal.App.4th 149, 163; *People v. Romero* (2006) 140 Cal.App.4th 15, 19-20; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198-1199.)

5. *The Penal Code Section 12022.53 Enhancements Were Constitutional.*

Appellant claims imposition of the Penal Code section 12022.53 enhancements on counts 1 and 3 violated his right to equal protection. He argues "this court must determine whether someone who aids and abets a principal in an offense committed for the benefit of a 'criminal street gang' is similarly situated to a person who aids and abets a confederate in an offense committed for the benefit of another type of group or organization" and, if so, whether disparate treatment is justified under the applicable standard. However, appellant has failed to show that these two persons are similarly situated (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 13), and this is fatal to his equal protection claim. (*Id.* at p. 12; cf. *People v. Hernandez* (2005) 134 Cal.App.4th 474, 483.)

6. *The Judgment Must Be Modified as to Count 3.*

Appellant's sentence included the upper term of five years in prison for his attempted second degree robbery conviction (count 3). Appellant claims the trial court erred because the sentence for attempted second degree robbery should have been an upper term of three years. Respondent concedes the error and that the judgment must be modified accordingly. We accept the concession. (*People v. Moody* (2002) 96 Cal.App.4th 987, 990; *People v. Huff* (1990) 223 Cal.App.3d 1100, 1106; Pen. Code, § 213, subd. (b).)

### *DISPOSITION*

The judgment is modified by changing only the prison term imposed for appellant's conviction for attempted second degree robbery (count 3) from five years to three years and, as modified, the judgment is affirmed. The trial court is directed to forward to the Department of Corrections an amended abstract of judgment reflecting the above modification.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

CROSKEY, J.

18