[No. B175866. Second Dist., Div. Seven. Nov. 28, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
RUBEN JOE HERNANDEZ, Defendant and Appellant.

[No. B185049. Second Dist., Div. Seven. Nov. 28, 2005.]

In re RUBEN JOE HERNANDEZ, on Habeas Corpus.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I and II.

**COUNSEL**

Neil Rosenbaum, under appointment by the Court of Appeal, for Defendant and Appellant.

Ruben Joe Hernandez, in pro. per., for Petitioner.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews and Adrian N. Tigmo, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—A jury found appellant Ruben Joe Hernandez guilty of first degree murder. It also found true allegations the crime was committed for the benefit of a criminal street gang, a principal personally used and discharged a firearm causing death, and Hernandez had suffered a prior conviction and prison term. In sentencing Hernandez, the trial court imposed a term of 25 years to life for the murder and added a consecutive term of 25 years to life under Penal Code section 12022.53, subdivisions (d) and (e)(1).[1] On appeal

---

[1] All statutory references are to the Penal Code unless otherwise specified.

Hernandez contends the evidence was insufficient to convict him of murder and section 12022.53, subdivision (e)(1) is unconstitutional because it treats aiders and abettors in killings for the benefit of a street gang more severely than aiders and abettors in killings for the benefit of other groups. In a petition for habeas corpus Hernandez claims his conviction resulted from the ineffective assistance of his trial counsel. We ordered the petition for habeas corpus heard together with the appeal.

For the reasons set forth below we affirm the judgment and deny the petition.

## FACTS AND PROCEEDINGS BELOW

Late one night Eric Estrada stood on the balcony of an apartment building on Poplar Avenue in Montebello drinking with some friends who lived in the building. One of these friends, Joseph Bernal, was a member of Metro 13. Estrada did not belong to a gang.

The group on the balcony saw a white Chevrolet Suburban drive slowly past the building. Bernal thought he recognized the car as belonging to a member of a rival gang, Southside Montebello.[2] Bernal had had previous run-ins with members of Southside, including defendant Hernandez. He ran to get a weapon in case the people in the car were "to try something." In the meantime the Suburban made a U-turn and stopped in front of the apartment building. Dolores Guillen, one of the persons on the balcony, yelled: "Get inside. Get inside. This fool's coming back." Dolores, her sister Rosemary and some others who had been on the balcony quickly ran into Dolores's apartment. Estrada did not.

Looking out the apartment window Rosemary saw a person in a white sweatshirt walking up the driveway. She lost sight of the person for a short time. Then she heard footsteps running up the stairs and a voice shout "Southside Montebello!" When the person came back in view she could see part of his face. The person was pointing a gun at someone and saying: "Where you from? Are you from Metro?" She heard a voice reply: "I ain't from any gang." At that point Rosemary backed away from the window. Moments later she heard a shot and heard footsteps running down the stairs. Estrada had been shot once in the head. He died a few days later.

Howard Cuglietta, another resident of the apartment building, testified he had gotten out of bed to use the bathroom and drink a glass of milk when he heard noises outside. He peeked through his blinds and saw a man in "kind of

---

[2] A Montebello police detective testified members of Southside and Metro had been attacking and assaulting one another for at least 15 years.

a grayish sweat shirt with a hood" walk down the driveway and get in the back seat of a car. Then he heard a gunshot and "a few seconds after that" a man dressed in black came down the stairs and got in the front seat of the car. He did not see the men's faces. Cuglietta admitted he told the police a few hours after the shooting the man in black had been the first to get into the car and the man in the white or gray sweat shirt was the one who later came down the stairs.

Mark Chacon, a member of the Southside Montebello gang, entered into a plea bargain with the prosecution in which he admitted to a charge of manslaughter in the Estrada slaying and accepted a 13-year prison term in exchange for his testimony against defendant Hernandez. Chacon testified as follows.

On the night of the murder he drove his white Suburban to the home of defendant Hernandez, a fellow Southside gang member. The two of them picked up a third gang member, Raymond Doktorczyk, and then drove to a friend's house where they visited and drank beer for a short time. Hernandez was wearing a black jacket and was armed with a .38 revolver. Chacon did not know if Doktorczyk had a gun and could not remember what he was wearing.

Around midnight Chacon, Hernandez and Doktorczyk left to go "cruising" in Chacon's car. Chacon drove, Hernandez sat in the front passenger seat and Doktorczyk sat in the rear. They made their way to Poplar Avenue in Montebello where Chacon knew members of a rival gang, Metro 13, congregated. According to Chacon they were not "hunting" for rival gang members but if they saw any they were going to "gang bang," "fight," and "maybe more . . . if it leads to that." Chacon drove slowly past the apartment building where Estrada and his friends were standing on the balcony. Either Hernandez or Doktorczyk said "Turn around." Chacon made a U-turn and drove back to the apartment building "to see if there was anybody from Metro there." He parked in front of the driveway and Hernandez and Doktorczyk got out of the car.

Asked what he thought Hernandez and Doktorczyk were going to do Chacon answered he thought they were going to "hit them up." "Hit them up," he explained, meant "ask them where they were from" which is a challenge in gang culture.

Chacon lost sight of Hernandez and Doktorczyk when they went up the driveway. Moments later he heard a gunshot and the two men came running back to the car. Hernandez was carrying the revolver and got into the front seat. Doktorczyk got in the back. Chacon testified to statements made by

Doktorczyk and Hernandez as they drove away. According to Chacon, "[Doktorczyk] goes 'I hit that fool' and then he said he just shot him." Chacon turned to Hernandez and asked what happened. Hernandez replied, "I shot that fool because he got too close." Chacon later clarified his testimony regarding Doktorczyk's statement. He explained Doktorczyk did not say "I shot him" he said "he" shot him, the "he" referring to Hernandez.

A Montebello police officer testified a search of Doktorczyk's residence produced a white sweat shirt. The shirt was not shown to the jury.

In closing argument the prosecutor acknowledged the evidence would allow a reasonable juror to conclude either Hernandez or Doktorczyk fired the shot which killed Estrada, but contended it really did not matter which one was the shooter. Even assuming Doktorczyk was the shooter, Hernandez was an aider and abettor and therefore equally guilty of murder.

The jury found Hernandez guilty of first degree murder. It also found he committed the murder for the benefit of a criminal street gang under section 186.22 and that he had suffered a prior prison term. As to the gun enhancements, the jury found it true that in the commission of the offense a principal personally used a firearm, true that a principal personally and intentionally discharged a firearm and true that a principal personally and intentionally discharged a firearm which proximately caused the death of the victim. The jury, however, found it not true that Hernandez personally used or discharged a weapon in the commission of the crime.

The trial court sentenced Hernandez to a term of 25 years to life for the murder, a consecutive 25 years to life for the gun discharge enhancement and a consecutive one year term for the prior prison term enhancement. The gang enhancement was stayed. Hernandez filed a timely appeal.

## DISCUSSION

### I., II.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

---

*See footnote, *ante*, page 474.

## III. SECTION 12022.53 DOES NOT DENY THE RIGHT OF EQUAL PROTECTION OR DUE PROCESS OF LAW TO THOSE WHO AID AND ABET A GANG-RELATED MURDER IN WHICH THE PERPETRATOR USES A GUN.

■ Section 12022.53, subdivisions (d) and (e)(1)(B) when read together require the trial court to impose a consecutive 25-years-to-life sentence enhancement when a defendant is convicted of murder for the benefit of a criminal street gang and "[a]ny principal in the offense" "personally and intentionally discharges a firearm and . . . causes . . . death, to any person other than an accomplice."[35] (Italics added.) Under this sentencing regime an aider and abettor who is found guilty of murder is subject to the 25 years to life enhancement even though he or she did not personally and intentionally discharge a firearm causing death if the murder was committed for the benefit of a criminal street gang and "any principal" in the offense personally and intentionally discharged a firearm causing death.[36] In all other killings subject to section 12022.53, subdivision (d)—that is, killings not for the benefit of a criminal street gang—a principal, including an aider and abettor, is only subject to the 25-year enhancement if he or she personally and intentionally discharged a firearm causing death.

■ In *People v. Gonzales*, a case not cited by either party, the Court of Appeal upheld this sentencing scheme against a claim it unreasonably discriminated between aiders and abettors of gang crimes and other aiders and abettors.[37] The court held defendants had failed to meet a prerequisite for equal protection analysis—a showing the two groups being compared are sufficiently similar with respect to the purpose of the law in question to trigger an inquiry into whether their disparate treatment is justified.[38]

---

[35] Section 12022.53, subdivision (d) states: "Notwithstanding any other provision of law, any person who, in the commission of [murder] personally and intentionally discharges a firearm and proximately causes . . . death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." Subdivision (e)(1) of section 12022.53 provides: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of section 186.22 [i.e., committed the offense for the benefit of a criminal street gang and with the specific intent to promote, further or assist in any criminal conduct by gang members]. [¶] (B) *Any principal* in the offense committed any act specified in subdivision (b), (c) or (d)." (Italics added.)

[36] Under section 31 a "principal" includes not only those persons who directly commit the act but also those who "aid and abet in its commission."

[37] *People v. Gonzales* (2001) 87 Cal.App.4th 1, 12–13 [104 Cal.Rptr.2d 247].

[38] *People v. Gonzales, supra,* 87 Cal.App.4th at page 12.

"Defendants' arguments fail to establish that they are similarly situated to other aider and abettors," the court stated, because "[u]nlike other aiders and abettors who have encouraged the commission of a target offense resulting in a murder, defendants committed their crime with the purpose of promoting and furthering their street gang in its criminal conduct."[39]

Hernandez makes a more narrow claim of unconstitutionality. He argues section 12022.53 violates the guarantee of equal protection of the law because it unreasonably discriminates between aiders and abettors of firearm users who commit murder for the benefit of a "criminal street gang" and aiders and abettors of firearm users who commit murder for the benefit of equally dangerous criminal associations such as drug cartels, White supremacist groups and terrorist organizations.

Certainly a cogent argument can be made those who aid and abet a murder for the benefit of a "criminal street gang" are similarly situated with those who aid and abet a murder for the benefit of other outlaw organizations. Indeed it could be argued the two classes of aiders and abettors are so similar section 12022.53 does not distinguish between them and there is no equal protection issue.[40] Assuming Hernandez has established disparate treatment of similarly situated aiders and abettors his equal protection claim nevertheless fails.

Hernandez contends the sentencing scheme in section 12022.53, subdivisions (d) and (e)(1) is unconstitutional on the grounds it is underinclusive and overinclusive.

It is beyond dispute the state has a legitimate interest in suppressing criminal street gangs. Hernandez concedes this. He also acknowledges the state has a legitimate interest in punishing criminal gun use more severely than the use of other weapons. But, he maintains, the sentencing scheme in section 12022.53, subdivisions (d) and (e)(1) is underinclusive because it punishes aiders and abettors of crimes committed for the benefit of street

---

[39] *People v. Gonzales, supra,* 87 Cal.App.4th at page 13.

[40] Section 186.22, subdivision (f) defines a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [specific criminal acts including murder, robbery, arson, kidnapping and torture], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." Although the statute was aimed at gangs such as the Bloods, the Crips and Southside Montebello (see § 186.21), a case could be made it also covers the White Knights of the Ku Klux Klan, the "Mexican Mafia," and Al-Qaeda.

gangs more severely than aiders and abettors of crimes committed for the benefit of other groups which are equally or more dangerous than street gangs including hate groups, terrorist organizations and the like.

■ Courts have long recognized, however, a Legislature "acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach." It may direct its attention " 'to those classes of cases where the need is deemed to be clearest.' "[41] In enacting the street gang legislation in 1988 the Legislature found, among other things, "in Los Angeles County alone there were 328 gang-related murders in 1986, and that gang homicides in 1987 have increased 80 percent over 1986."[42] When the Legislature enacted section 12022.53 10 years later and made aiders and abettors of gang crimes involving gun use equally liable with the actual perpetrator it did so "in recognition of the serious threats posed to the citizens of California by gang members using firearms."[43] As our Supreme Court has stated, the Legislature "is not prohibited by the equal protection clause from striking the evil where it is felt the most."[44]

Hernandez further maintains the sentencing scheme in section 12022.53, subdivisions (d) and (e)(1) is overinclusive because it imposes the draconian punishment of 25 years to life on aiders and abettors whose relationship with the street gang may, in his words, be only "nominal, passive or purely technical."[45] Statutes such as section 12022.53 which affect the fundamental right of liberty must be subjected to strict scrutiny, Hernandez argues, and subdivisions (d) and (e)(1) cannot survive such scrutiny because they are not narrowly tailored to address the state's legitimate interest in deterring gun use by gang members. We find this argument unpersuasive for several reasons.

Initially we do not believe Hernandez has standing to bring an equal protection challenge to the statute "as applied" to aiders and abettors who have only a tangential relationship with the street gang for whose benefit the crime was committed. In the present case substantial evidence exists to show Hernandez had more than a "nominal, passive or purely technical" relationship with Southside Montebello. Even though Hernandez suffered an " 'injury

---

[41] *West Coast Hotel Co. v. Parrish* (1937) 300 U.S. 379, 400 [81 L.Ed. 703, 57 S.Ct. 578].

[42] Section 186.21.

[43] *People v. Gonzales, supra,* 87 Cal.App.4th at page 19, quoted with approval in *People v. Garcia* (2002) 28 Cal.4th 1166, 1172, 1176 [124 Cal.Rptr.2d 464, 52 P.3d 648].

[44] *Werner v. Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 132 [216 P.2d 825].

[45] Compare section 186.22, subdivision (a), which punishes a person who "actively participates" in a criminal street gang.

in fact' "—he was sentenced under the challenged statute—he has not shown he has a "close relationship" with any tangential aider and abettor or that there is any reason why persons with tangential relationships to a gang could not raise an equal protection challenge in their own right.[46]

Furthermore, although our Supreme Court has applied strict scrutiny to invalidate a sentencing scheme which punished young people more severely than adults convicted of the same crime,[47] subsequent Court of Appeal decisions have not read this case as requiring strict scrutiny of every criminal law imposing punishment.[48] Where as here the question is not whether to deprive Hernandez of his liberty but for how long, we believe rational basis review, not strict scrutiny, is the appropriate test to resolve an equal protection challenge.

Clearly the Legislature had a rational basis for imposing a 25-years-to-life enhancement on one who aids and abets a gang-related murder in which the perpetrator uses a gun, regardless of the relationship between the aider and abettor and the perpetrator. As we previously observed, the purpose of this enhancement is to reduce through punishment and deterrence "the serious threats posed to the citizens of California by gang members using firearms."[49] One way to accomplish this purpose is to punish equally with the perpetrator a person who, acting with knowledge of the perpetrator's criminal purpose, promotes, encourages or assists the perpetrator to commit the murder. It is irrelevant to this purpose whether the aider and abettor was a hard-core gang member or merely a "wannabe."

Finally, Hernandez contends section 12022.53, subdivisions (d) and (e)(1) violate due process because they allow the imposition of an enhancement on an aider and abettor when the perpetrator uses or discharges a firearm without any requirement the aider and abettor knew or intended the murder be committed by the use or discharge of a firearm. This same argument was made and rejected in *People v. Gonzales*.[50] We agree with the reasoning in *Gonzales*.

---

[46] *Powers v. Ohio* (1991) 499 U.S. 400, 411 [113 L.Ed.2d 411, 111 S.Ct. 1364].

[47] *People v. Olivas* (1976) 17 Cal.3d 236, 250–251 [131 Cal.Rptr. 55, 551 P.2d 375].

[48] See for example, *People v. Alvarez* (2001) 88 Cal.App.4th 1110, 1116 [106 Cal.Rptr.2d 447]; *People v. Owens* (1997) 59 Cal.App.4th 798, 802 [69 Cal.Rptr.2d 428]; *People v. Bell* (1996) 45 Cal.App.4th 1030, 1047–1049 [53 Cal.Rptr.2d 156]; *People v. Kilborn* (1996) 41 Cal.App.4th 1325, 1330–1331 [49 Cal.Rptr.2d 152]; and see *People v. Gonzales, supra,* 87 Cal.App.4th at page 13 and cases cited therein.

[49] *People v. Gonzales, supra,* 87 Cal.App.4th at page 19.

[50] *People v. Gonzales, supra,* 87 Cal.App.4th at pages 13–15.

## DISPOSITION

The judgment is affirmed. The petition for a writ of habeas corpus is denied.

Perluss, P. J., and Woods, J., concurred.

A petition for a rehearing was denied December 15, 2005, and appellant's petition for review by the Supreme Court was denied February 22, 2006, S139984.