Filed 7/7/14  P. v. Olloqui CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B248998 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA314454) |
| v. | |
| OSCAR OLLOQUI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lance A. Ito, Judge.  Affirmed as modified.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie A. Miyoshi, Deputy Attorney General, and David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted defendant and appellant Oscar Olloqui of murder (Pen. Code, § 187, subd. (a) [count 1]),[1] second degree burglary (§ 459 [count 2]), attempted robbery (§§ 664, 211 [count 3]), and forgery (§§ 475, subd. (c), 476 [count 5]).[2] The jury found true the allegations that defendant committed the murder while engaged in burglary and/or attempted robbery. (§ 190.2, subd. (a)(17).) As to all counts, the jury found true the allegations that a principal personally used, intentionally discharged, and proximately caused great bodily injury or death with a firearm (§ 12022.53, subds. (b)-(e)), and the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A)).[3]

In count 1, defendant was sentenced to life in prison without parole, plus 25 years-to-life for the firearm enhancement. The trial court selected count 3 as the principal term, and imposed a determinate sentence of 13 years 4 months, consisting of 2 years, plus 10 years for the gang enhancement; a consecutive 8 months for count 2; and a consecutive 8 months for count 5.

Defendant contends: (1) there was insufficient evidence to support the jury's finding that he acted with reckless indifference to human life; (2) the firearm enhancements for counts 2 and 5 must be stricken; (3) imposition of a 25 years-to-life term for a vicarious firearm use enhancement violated his rights to due process and equal protection; and (4) the consecutive sentences in counts 2, 3, and 5, and attendant enhancements, must be stayed under section 654.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] Pursuant to section 1118.1, count 4 (forgery, §§ 475, subd. (c), 476) and count 6 (receiving stolen property, § 496, subd. (a)) and the enhancements attached to those counts were dismissed. The special circumstances allegation under section 190.2, subdivision (a)(22), that defendant committed the murder while an active participant in a criminal street gang to further the activities of the street gang was stricken.

[3] Codefendants Steven Cuellar and Christian Vega were tried separately. Defendant and codefendant Erick Bautista were tried jointly but with separate juries.

Our review of the record disclosed that the abstract of judgment did not conform to the oral pronouncement of judgment. The abstract reflects that the 10-year gang enhancement (§ 186.22, subd. (b)(1)(A)) and the stayed firearm enhancement (§ 12022.53, subds. (d) and (e) (1)) applied to the second degree burglary in count 2 rather than the attempted robbery in count 3. We invited the parties to submit further briefing on these issues. They are in agreement with our conclusion that the abstract of judgment must be corrected to reflect that the gang and gun use enhancements attach to count 3. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 (*Mitchell*) [when there is a discrepancy between the oral pronouncement of a sentence and the abstract of judgment, the oral pronouncement controls].) The Attorney General additionally concedes, and we agree, that the sentences in counts 2, 3, and 5, and the enhancements in count 3 must be stayed pursuant to section 654. In all other respects, the judgment is affirmed.

**FACTS**

*Prosecution*

On October 19, 2006, Injun Cho's Print Shop was burglarized. Ricardo Ramirez, defendant's roommate and a former Print Shop employee, brought computers and blank checks taken from the Print Shop back to the basement where they lived. Marcela Galindo forged signatures on the checks. Defendant was given two or three of the checks a few days later. Galindo and defendant's friend, Judith Cabrera, cashed some of the checks at Maple Liquor and Market on 30th Street and Maple Avenue, which was owned by brothers Sam and Simon Khalil.[4] When the forged checks were cashed, the money was either kept by the person who passed them, or divided. Cabrera split the proceeds of a forged check with defendant on one occasion.

---

[4] We refer to the Khalils by their first names for clarity.

Cho closed the Print Shop's checking account five days after the burglary. Sam and Simon stopped cashing checks from the Print Shop after several of the checks were returned unpaid.

In the early afternoon of November 2, 2006, Simon was working in the market at the counter and Sam was behind a door in the restaurant section. Sam heard Steven Cuellar demand that Simon hand over "all the money." Erick Bautista aimed a shotgun at Simon, and Cuellar pointed a handgun at him. Approximately five seconds later, Sam heard a gunshot. Sam entered the market and saw Simon unconscious on the ground. Bautista and Cuellar fled the market. Sam called 9-1-1. Simon died as a result of the gunshot wound.

Karla Medina heard a gunshot from inside the market when she was stopped at a red light at the intersection of Maple Avenue and 30th Street. She saw Bautista and Cuellar come out of the market and heard someone scream. Bautista and Cuellar began running down Maple Avenue. Bautista put an object that resembled a gun into a backpack. Medina followed them in her car on Maple Avenue. She saw two men inside a dark-colored SUV parked on Maple Avenue. Bautista and Cuellar got into the SUV, and the vehicle sped away recklessly "like somebody was chasing them." Medina called 9-1-1.

Nathaniel Barnes was in the area of the market on the day of the shooting, when he walked by Bautista and Cuellar squatting over a backpack. One of the men said, "Come on, get it." Barnes saw the butt of a shotgun in the backpack. Barnes continued walking, turning onto 31st Street. He noticed defendant and Christian Vega in a dark SUV at the intersection of 31st Street and Maple Avenue. The engine was running, and the van repeatedly rolled up to the stop sign and then rolled back. Barnes became suspicious because he had never seen anyone park there before. As he walked past the van, defendant, who was driving the vehicle, said, "I'll take care of you," and "keep on walking." Barnes went into the market a few minutes later and saw Simon on the floor.

Police arrived and recovered an expended .38-caliber shell casing from the market floor. Sam gave the market's surveillance videotape to police. It showed Bautista and

4

Cuellar entering the market. Cuellar wore a white shirt and a black back brace, and Bautista wore a black jacket and carried a black backpack. Cuellar attempted to cash a check, Simon refused, and a confrontation ensued. Bautista pointed a sawed-off shotgun at Simon and Cuellar pointed a handgun at him. Cuellar shot Simon, and he and Bautista ran out of the market. Sam also turned over a videotape of an earlier incident in which Cuellar cashed a check at the market.

On December 20, 2006, officers arrested Cuellar at his home. They seized a .38-caliber semiautomatic pistol, a sawed-off shotgun, and shotgun ammunition.

Bautista was arrested at home on December 22, 2006. He was interviewed by Detective Sunny Romero of the Los Angeles Police Department. Bautista admitted belonging to the Playboys gang. At first he denied he was involved in the shooting, but he later confessed he went into the market with Cuellar. He said he wanted to cash a check, but he did not intend to rob the market, and he did not know that Cuellar was going to shoot Simon. He could not explain why he aimed a shotgun at Simon.

Los Angeles Police Officer Ronald Berdin testified as an expert on the Playboys gang, to which defendant, Cuellar, Bautista, and Vega belong. Among other things, Officer Berdin testified to the primary criminal activities of the Playboys. He opined that in a hypothetical situation with facts identical to the instant case, the crimes would be committed in association with and for the benefit of a criminal street gang.[5]

## ANALYSIS

*Substantial Evidence Supporting Reckless Indifference to Human Life Finding*

At trial, Officer Berdin testified that he was assigned to the Newton Division, which contains the Playboys gang's territory. Officer Berdin had nearly 16 years of

---

[5] Defendant's defense focused on mistaken identification. He does not challenge the jury's findings regarding his identification here.

experience as a police officer, and interacted with gang members to obtain information about criminal gangs on a regular basis. Defendant, Batista, Vega, and Cuellar are members of the Playboys gang. Officer Berdin testified to the Playboys gang's primary activities, including felony vandalism, felony weapons possession, narcotics sales, robberies, vehicle theft, assaults with deadly weapons, and attempted murders. Officer Berdin based his conclusions on conversations with gang members, the conviction of Playboys member Jose Ramos for possession of cocaine base for sale, the conviction of Playboys member Jose Segoviano for robbery, and the conviction of Playboys member Victor Perez for attempted murder. The trial court allowed Officer Berdin to testify to the Ramos, Segoviano, and Perez convictions to establish the basis for his opinions concerning the gang's primary activities, but instructed the jury prior to the testimony that the testimony should be considered only for the purpose of evaluating the expert's opinion and not for any other purpose. During Officer Berdin's testimony on the convictions, the prosecutor asked him if the convictions were related to the present case, and Officer Berdin confirmed that they were not.

Officer Berdin testified regarding gang culture, and the culture within the Playboys gang in particular. He formed his opinions based on conversations with numerous gang members, in addition to his personal experiences and conversations with other law enforcement officers. The younger gang members, generally aged from fourteen to their early twenties, are "soldiers" who "put in work," or commit crimes. Soldiers commit more crimes than older members in order to elevate their status within the gang and the gang's status generally. Young gang members must deal harshly with a victim if he or she resists, to protect their reputation and the gang's. If a soldier commits enough crimes and/or has served time in prison, his status may be elevated to "shot caller." Shot callers have usually performed violent acts in the past, and the more violent the crimes they have committed, the more respect they gain. They commit fewer crimes than soldiers, who have yet to prove their loyalty to the gang. Younger gang members aspire to be shot callers.

Given a hypothetical with facts mirroring this case, Officer Berdin opined that the crimes would have been committed in association with a criminal street gang, and would have benefitted the gang. In such a situation, the two younger gang members committing the crimes would be dependent on the older gang members to help them escape from the scene. It is common to have older gang members overseeing younger gang members who are committing violent crimes to substantiate the claims of the younger members. Crimes will generally be planned by the older members and discussed by all participants. The older members also act as protection against rival gang members and police. Their reputations are enhanced by the violent acts of the younger members who they supervise. They need to know what the younger members' plans are in order to respond to the situation if the need arises. A younger member who changed the plan for commission of a crime escalating matters would "definitely be dealt with."

The trial court prohibited Officer Berdin from testifying with respect to whether older gang members in a getaway vehicle would know that the younger gang members committing the crimes were armed, and also prohibited testimony that gang members would generally be aware of whether other gang members were armed. The court did allow the prosecution to argue that defendant would have been aware that Bautista and Cuellar were armed.

The prosecution argued that defendant was a primary participant in the crimes and acted with reckless indifference to human life. The jury was instructed that the testimony on primary activities was only admissible to prove the gang allegation, and not for any other purpose, including evidence of bad character.

Defendant contends that Officer Berdin's testimony regarding the Playboys gang's primary criminal activities and his opinion that crimes in a similar hypothetical case were committed for the benefit of a gang were inadmissible. He asserts that if the expert's testimony on these matters had been properly excluded, the remaining evidence would be insufficient to support the jury's finding that he aided and abetted the burglary and/or robbery with reckless indifference to human life. Alternately, he argues that even assuming the expert's testimony was admissible, the evidence was insufficient.

7

Defendant asserts that no evidence was proffered to show that defendant knew Cuellar and Bautista were armed, they planned to commit robbery, or that there had been a shooting or that someone had been harmed when Cuellar and Bautista returned to the vehicle.

A defendant convicted of felony murder on an aiding and abetting theory may be subjected to the death penalty or life in prison without parole pursuant to section 190.2, subdivision (d), if the defendant acted with reckless indifference to human life. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 298 (*Tapia*).) Section 190.2, subdivision (d) "brings state law into conformity with *Tison v. Arizona* (1987) 481 U.S. 137, 158 [*Tison*]. . ." (*Tapia*, *supra*, 53 Cal.3d at p. 298, fn. 16), which defines reckless indifference to human life as the "subjective[] appreciat[ion] that their acts [are] likely to result in the taking of innocent life," (*Tison*, *supra*, 481 U.S. 137, 164).

The standard of review of the sufficiency of the evidence of a felony-based special circumstances allegation is substantial evidence. (*People v. Thompson* (1980) 27 Cal.3d 303, 322-323 (*Thompson*).) We "examine the evidence in the present case to determine whether it is sufficient to uphold the jury's findings that the robbery and burglary special circumstances were true beyond a reasonable doubt. In making this determination, 'the court must review *the whole record* in the light most favorable to the judgment below to determine whether it discloses substantial evidence - that is, evidence which is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Johnson* (1980) 26 Cal.3d 557, 578, italics added.)" (*Thompson, supra*, 27 Cal.3d at pp. 322-323, fn. omitted.) Circumstantial evidence may establish intent. (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

With respect to defendant's contention that Officer Berdin's testimony on the Playboy gang's primary activities and his opinion that the crimes were for the benefit of the gang were inadmissible, we review the trial court's admission of expert testimony for abuse of discretion. (*People v. Ward* (2005) 36 Cal.4th 186, 210.) We agree with the

Attorney General that the gang expert's testimony was admissible under long-established precedent.

"The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1465.) Here, Officer Berdin had a decade and a half of experience with gangs, investigated gang-related crimes, conversed with gang members about the crimes their gangs committed, and obtained information from his colleagues. There was a sound basis for his opinion relating to the Playboys gang's primary criminal activities. Additionally, the jury was properly instructed at the time the testimony was given and again before deliberations, that the expert's opinion was to be considered for the purposes of the gang allegation only, and the prosecutor elicited testimony from Officer Berdin, confirming that the crimes committed by other gang members did not relate to the present case.

Moreover, the prosecution's gang expert may testify about whether the defendant acted for the benefit of, at the direction of, or in association with a gang, even though it is an ultimate factual issue for the jury to decide, where such matters are beyond the common experience of the jury. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 508-509.) Opinion testimony may be elicited by presenting hypothetical questions based on facts in the record that the expert is instructed to presume to be true. (*People v. Vang* (2011) 52 Cal.4th 1038, 1045 (*Vang*).) Here, the prosecutor properly proposed a hypothetical tracking the facts of the present case. The hypothetical did not include a conclusion as to whether the gang members in the getaway vehicle would have known the principals were armed, and thus is distinguishable from *People v. Killebrew* (2002) 103 Cal.App.4th 644, upon which defendant relies. (*Id*. at p. 658, disapproved on another ground in *Vang, supra,* at pp. 1047-1049 [trial court abused its discretion in admitting expert's testimony regarding the subjective knowledge and intent of each defendant as opposed to the expectations of gang members generally in a specific situation.].) We conclude that the

9

trial court did not abuse its discretion, because the expert's testimony was admissible with respect to both issues.[6]

Substantial evidence supports the jury's finding that defendant acted with indifference to human life. At the time the crimes were committed, Bautista and Cuellar were 16 years old, Vega was 27, and defendant was 28. It would be reasonable to infer that defendant and Vega, who were a decade senior to the other two, were shot callers, had orchestrated the crimes, knew that Bautista and Cuellar were armed, and knew that they would rob the market or otherwise react violently if Simon resisted.

Officer Berdin testified that older gang members often plan violent crimes and supervise younger members committing them. They must be aware of the plan, so that they are prepared to react appropriately if any issues arise during the commission of the crime. Here, defendant and Vega's reactions were consistent with the actions of criminals who have planned a robbery. Barnes testified that defendant had the van running, and was drifting back and forth at the stop sign. When Barnes approached, defendant threatened him to keep going or he would be taken care of. These actions are inconsistent with a plan to merely pass a forged check. If defendant had expected Bautista and Cuellar to simply cash the check and leave, there would be no reason to leave the van on or to ward off onlookers, as there would be no expectation of detection. It would also not be necessary to send two gang members into the market. On a previous occasion, Cuellar had gone into the market alone to pass a forged check. The jury could reasonably infer that the presence of two gang members inside the market, rather than one, was due to the need for backup in the more dangerous situation where a robbery was planned. Also consistent with a planned robbery was the involvement of four gang

---

[6] We also reject defendant's argument that allowing Officer Berdin to relay hearsay information as the basis of his opinion violated his right to confront witnesses. Experts may relate hearsay if it is of the type generally relied upon by experts in the field. (*People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210.) Such testimony is not offered for its truth, but as a means for the jury to assess the weight to give the expert's opinion. (*Id*. at p. 1210.)

members total to carry out the crime – a gunman, a backup, a lookout, and a driver. Passing a forged check hardly warrants that level of manpower.

Officer Berdin testified that younger gang members have to commit violent crimes to gain respect and trust. The jury could infer that the two younger men were proving that they should be trusted and respected because they carried out a violent crime. Although they would be motivated to commit a violent crime planned by older gang members, Bautista and Cuellar would be unlikely to intentionally escalate a situation without first informing the older gang members. Doing so would increase the risk that the older members would be caught and punished for participating in the crime, or that they themselves would be "dealt with" by other gang members for taking such a risk without prior clearance.

Finally, the jury could reasonably believe that defendant was able to hear the gunshot from around the block. Medina heard it from outside the building in her car and the distance was not that much greater than that of defendant. Defendant's action of speeding away recklessly belies the argument that he believed Bautista and Cuellar had only passed a forged check. In that situation, common sense would dictate driving away quietly so as not to attract attention, whereas during a robbery and shooting, attention is already focused on the perpetrators, and the primary goal is to escape the area quickly. Given the substantial circumstantial evidence that defendant was aware of the robbery and therefore subjectively appreciated that it was likely to result in death, we conclude the jury's special circumstances finding was supported.

***Propriety of Firearm Enhancements for Burglary and Robbery***

Defendant contends that the firearm enhancements in counts 2 and 5 must be stricken, rather than stayed. As discussed at the beginning of our opinion, the abstract of judgment erroneously reflects that the firearm enhancement attached to count 2, rather than count 3, as pronounced. The trial court is directed to correct that discrepancy. (*Mitchell*, *supra,* 26 Cal.4th at p. 185 [when there is a discrepancy between the oral

11

pronouncement of a sentence and the abstract of judgment, the oral pronouncement controls].) Neither the pronouncement, the minute order, nor the abstract of judgment imposed a firearm enhancement in count 5, so defendant's argument as to that count is without merit.

*Constitutional Validity of the Vicarious Firearm Use Enhancement*

Subdivisions (d) and (e)(1) of section 12022.53 require the trial court to add a consecutive 25 years-to-life term to the sentence of a defendant convicted of murder or attempted murder for the benefit of a criminal street gang, when the jury finds that a principal in the offense personally and intentionally discharged a firearm, causing death or great bodily injury to the victim. Defendant argues that imposition of the 25 years-to-life sentence for the vicarious firearm use enhancement pursuant to section 12022.53, subdivision (e)(1), violates his constitutional rights to due process and equal protection of the law. He acknowledges that these arguments were rejected in *People v. Gonzales* (2001) 87 Cal.App.4th 1 (*Gonzales*), and *People v. Hernandez* (2005) 134 Cal.App.4th 474 (*Hernandez*). We see no reason to depart from the holdings in *Gonzales* and *Hernandez*, as the facts in this case are indistinguishable.

### Equal Protection

Defendant argues that there is no legitimate state interest for classifying aiders and abettors in gang cases differently from aiders and abettors in other cases, or in distinguishing aiders and abettors in gang cases where the actual shooter receives the same punishment regardless of whether the shooting is gang-related. He additionally argues that the statute is not sufficiently narrowly tailored to effectuate a legitimate state interest, because it contains no requirement of active participation in a gang.

"Broadly stated, equal protection of the laws means 'that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons

12

or other classes in like circumstances in their lives, liberty and property and in their pursuit of happiness.' [Citation.]" (*People v. Wutzke* (2002) 28 Cal.4th 923, 943.) In making such a claim, the defendant bears the burden to show "'that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.]" (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1199.) Once that burden is met, the statute is given "'some level of scrutiny to determine whether distinctions between the two groups justify the unequal treatment.' [Citation.]" (*Id.* at p. 1200.) The statute is subject to strict scrutiny when fundamental interests are involved, to determine whether it is necessary to achieve a compelling state interest. (*Ibid.*, citing *Romer v. Evans* (1996) 517 U.S. 620, 635.) "Where . . . a statute involves neither a suspect class nor a fundamental right, it need only meet minimum equal protection standards, and survive 'rational basis review.' [Citation.]" (*People v. Turnage* (2012) 55 Cal.4th 62, 74 (*Turnage*).)

There is no fundamental interest in the specific term of imprisonment a criminal defendant might receive; thus, equal protection challenges based on sentencing disparities are subject to the rational basis test. (*Turnage*, *supra*, 55 Cal.4th at p. 74.)

We conclude that *Hernandez* and *Gonzales* properly applied the rational basis test, and we agree with the reasoning of those cases. The state has a legitimate interest in suppressing criminal street gangs and "'the serious threats posed to the citizens of California by gang members using firearms'"; this provides a rational basis for greater punishment for those who aid and abet gang related shootings that result in death or great bodily injury. (*Hernandez*, *supra*, 134 Cal.App.4th at p. 482, fn. omitted.) Thus section 12022.53 "'is not prohibited by the equal protection clause from striking the evil where it is felt the most.'" (*Id.* at p. 482, fn. omitted; see also *Gonzales*, *supra*, 87 Cal.App.4th at pp. 12-13.)

With respect to defendant's argument that the statute is not sufficiently narrowly drawn, we disagree. It targets those who aid and abet murder or attempted murder for the benefit of a criminal street gang. The state has a legitimate interest in allotting greater

13

punishment to those who act to benefit a criminal gang where the result is a murder or attempted murder by shooting.

### Due Process

Defendant contends that imposing a drastically increased sentence on an aider and abettor convicted of first degree murder as the natural and probable consequence of the target offense violates his right to due process, citing to *People v. Beeman* (1984) 35 Cal.3d 547, 554-555, as did the defendant in *Gonzales*. He argues that due process requires that an aider and abettor know of the unlawful intent and purpose of the perpetrator before the 25 years-to-life enhancement may be applied.

We disagree. As the *Gonzales* court held, "[Section 12022.53, subdivision (e)] is expressly drafted to extend the enhancement for gun use in any enumerated serious felony to gang members who aid and abet that offense in furtherance of the objectives of a criminal street gang. Section 12022.53, subdivision (e) is precisely the clear expression of legislative intent to extend an enhanced penalty to aiders and abettors . . . [¶] [Defendant's] argument is contrary to aider and abettor jurisprudence in California. . . . [T]he only requirement is that the aider and abettor intend to facilitate the target offense and that the offense ultimately committed is the natural and probable consequence of the target offense." (*Gonzales*, *supra*, 87 Cal.App.4th at p. 15.)

### *Imposition of Separate Sentences for Burglary, Attempted Robbery and Felony Murder*

Defendant contends, and the Attorney General concedes, that the trial court was required by section 654 to stay the terms for burglary (count 2), attempted robbery (count 3), and forgery (count 5), as well as any attached enhancements. We agree.

Section 654, subdivision (a) provides, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case

14

shall the act or omission be punished under more than one provision." "In *Neal v. State of California* (1960) 55 Cal.2d 11, this court construed the statute broadly: "'Section 654 has been applied not only where there was but one 'act' in the ordinary sense . . . but also where a *course of conduct* violated more than one statute and the problem was whether it comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654.' [Citation.] [¶] Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' (*Id.* at p. 19, italics added.)" (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507.)

"The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312 (*Hutchins*).) "When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective." (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) " ' "We must 'view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' [Citation.]" [Citation.]' (*Hutchins*, *supra*, 90 Cal.App.4th at pp. 1312-1313.)" (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626-627.)

With respect to the forgery conviction, the Attorney General concedes, and we agree, the sentence must be stayed because defendant's commercial burglary conviction was based upon his entry into the market with the intent to commit forgery. (*People v. Hester* (2000) 22 Cal.4th 290, 297 [trial court may not sentence a defendant for burglary and underlying felony where entry was for the purpose of accomplishing the underlying felony]; *People v. Cline* (1998) 60 Cal.App.4th 1327, 1336 [burglary and theft].)

As to the commercial burglary and attempted robbery convictions, defendant argues that section 654 requires that the sentences imposed be stayed, because those crimes are the underlying felonies for his murder conviction.  Defendant is correct that where, as here, the prosecution relies *solely* on the felony-murder theory, the trial court is prohibited from sentencing defendant consecutively for the murder and underlying felonies.  (*People v. Meredith* (1981) 29 Cal.3d 682, 695-696; *People v. Boyd* (1990) 222 Cal.App.3d 541, 575-576 (*Boyd*); *People v. Mulqueen* (1970) 9 Cal.App.3d 532, 547; *People v. Magee* (1963) 217 Cal.App.2d 443, 470-472.)  This is because the underlying felony "is a statutorily defined element of the crime of felony murder" (*Boyd*, *supra*, at p. 576), and thus the underlying felony is "the same act which made the killing first degree murder" (*Id*. at p. 575).  Thus, the trial court erred in imposing consecutive sentences for defendant's commercial burglary (count 2) and attempted robbery (count 3) convictions.

Finally, the enhancements attached to count 3 must also be stayed.  (*People v. Bracamonte* (2003) 106 Cal.App.4th 704, 709 ["Where the base term of a sentence is stayed under section 654, the attendant enhancements must also be stayed"], overruled in part on other grounds as stated in *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130, fn 8.)

16

**DISPOSITION**

The trial court is directed to prepare a corrected abstract of judgment to properly reflect that the section 186.22 gang enhancement and section 12022.53 firearm enhancement attach to count 3 (attempted robbery [§§ 664, 211]) rather than count 2 (second degree burglary [§ 459]), and that defendant's sentences for burglary (count 2), attempted robbery and its attached enhancements (count 3), and forgery (count 5), are stayed pursuant to section 654. The trial court shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

KRIEGLER, J.

We concur:

TURNER, P.J.

MOSK, J.