Filed 5/8/15  P. v. Branch CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAQUAN RASHAD BRANCH et al.,<br><br>    Defendants and Appellants. | D067450<br><br><br><br>(Super. Ct. No. RIF1201399) |

APPEALS from judgments of the Superior Court of Riverside County, Bernard J. Schwartz, Judge.  Judgments against Daquan Rashad Branch and Caleb Marquan Henderson affirmed.  Judgment against Jeremy Walker reversed.

Richard de la Sota, under appointment by the Court of Appeal, for Defendant and Appellant Daquan Rashad Branch.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant Caleb Marquan Henderson.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant Jeremy Walker.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

In a joint trial by two jury panels, one jury (the "blue" jury) convicted Daquan Rashad Branch and Caleb Marquan Henderson of two counts each of attempted murder (Pen. Code, §§ 187, subd. (a), 664)[1] and one count each of active participation in a criminal street gang (§ 186.22, subd. (a)). The jury also found true two gang and firearms-related sentencing enhancements as to each attempted murder count. (§§ 186.22, subd. (b), 12022.53, subd. (e)(1).) The court sentenced Branch to an indeterminate term of 50 years to life imprisonment and a determinate term of nine years four months. Following Henderson's admission of a prior serious and violent felony conviction under section 667, subdivisions (c) and (e)(1), the court sentenced him to an indeterminate term of 50 years to life imprisonment and a determinate term of 27 years 8 months.

A separate jury (the "red" jury) convicted Jeremy Walker of two counts of attempted murder (§§ 187, subd. (a), 664) and one count of active participation in a criminal street gang (§ 186.22, subd. (a)). The jury found that the attempted murders were willful, deliberate, and premeditated. The jury also found true three gang and

---

1    Further statutory references are to the Penal Code unless otherwise specified.

firearms-related sentencing enhancements, including that Walker personally and intentionally discharged a firearm causing great bodily injury, as to each attempted murder count. (§§ 186.22, subd. (b), 12022.53, subds. (d) and (e)(1).) The court sentenced Walker to an indeterminate term of 80 years to life imprisonment.

Branch, Henderson, and Walker appeal. Branch contends the court erred by not requiring the prosecution to stipulate to certain gang-related facts. Henderson contends (1) his trial counsel was ineffective because he did not object to the admission of statements a former codefendant, Lareka Davis, gave to police on the grounds that she was coerced; (2) the court erred by not giving an instruction sua sponte that the jury should determine the voluntariness of Davis's statements before considering them for any purpose (or, in the alternative, his counsel was ineffective for failing to request such an instruction); (3) the court erred by not striking Henderson's prior serious and violent felony conviction under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*); (4) Henderson's aggregate prison sentence violates the prohibitions on cruel and unusual punishment in the federal and California Constitutions; and (5) the gang enhancement found by the jury violates the constitutional guarantee of equal protection. Walker contends the court erred by admitting evidence of his confession during an interrogation by sheriff's deputies because it was obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and because it was involuntary.

We conclude none of the contentions urged by Branch and Henderson have merit and accordingly affirm the judgments against them. As to Walker's contentions, we disagree that Walker's confession was obtained in violation of *Miranda*. However, we

3

agree it was involuntary.  The trial court therefore erred by denying Walker's motion to exclude it.  We further agree this error was prejudicial and accordingly reverse the judgment against Walker.

FACTS

For purposes of this section, we state the evidence in the light most favorable to the judgments.  (See *People v. Osband* (1996) 13 Cal.4th 622, 690; *People v. Dawkins* (2014) 230 Cal.App.4th 991, 994.)  Additional facts will be discussed where relevant in the following section.

On February 9, 2012, Jason G. walked with friends through the El Dorado apartment complex in Moreno Valley, California.  They were confronted by Henderson and two other individuals.  Henderson asked for Jason's gang affiliation.  Jason replied that he was a member of the Rolling 90's, a gang in Los Angeles.  Henderson said they were in Sex Cash territory, Web Block, referencing a prominent Moreno Valley gang and one of its cliques.  After this exchange, Jason and his friends went on their way.[2]

Later that day, Jason met his friend Kendrick P.  Kendrick was associated with the Harlem 30's, another Los Angeles gang.  Kendrick was familiar with Branch, Henderson, and Walker.  Kendrick had played video games with them that afternoon in an apartment in the El Dorado complex.  Lareka Davis was a tenant in that apartment.  Henderson stayed there as well, and Branch and Walker came by sometimes.

---

[2]    At trial, Jason testified that he had previously been mistaken for a member of the Wild Flax gang.  Wild Flax is a rival gang to Sex Cash.

4

Jason and Kendrick were walking through the El Dorado complex when they saw Davis talking on her cell phone near her apartment. Davis made a gesture towards them as they passed. Soon afterwards, Jason noticed they were being followed by three individuals, later identified as Branch, Henderson, and Walker. They closed the gap between themselves and Jason and Kendrick. Henderson yelled out "Web" or "Web Block" at least once, and Walker fired shots at Jason and Kendrick. Jason was struck once in the back, fracturing two ribs and puncturing a lung. Jason ran to a nearby apartment, where the occupant called police. Kendrick fled to a different apartment complex and told a security guard about the shooting.

The Riverside County Sheriff's Department responded to the scene of the shooting. Sheriff's deputies found five spent .380-caliber shell casings, as well as a live .380-caliber bullet. After further investigation, including interviews with the victims, sheriff's deputies obtained and executed a search warrant at Davis's apartment. Davis, Branch, and Henderson were inside. A deputy observed Branch attempting to escape over the balcony of the apartment and ordered him to stop. The search of the apartment revealed papers referencing the Web Block clique and a loaded .380-caliber handgun hidden in a bucket. Forensic examination of the handgun revealed insufficient DNA to conduct an analysis.

After her arrest, Davis told investigators she was at her apartment on the night of the shooting. She heard five loud booming sounds. A few minutes later, Branch and Henderson came back to the apartment sweating profusely. Davis was aware that

5

Branch, Henderson, and Walker were members of Sex Cash and had overheard them say "Web Block" in the past.[3]

Walker also gave a statement to investigators, which was admitted only into the evidence heard by his jury. Walker admitted he was part of the group that confronted Jason earlier in the day. Walker also admitted he, Branch, and Henderson followed Jason and Kendrick the night of the shooting, but he said one of the others was the shooter. Walker explained that they thought Jason or Kendrick was from Sex Cash's rival gang Wild Flax.

At trial, Jason described his encounter with Henderson and his friends earlier in the day. Jason also identified Henderson and Walker as two of the individuals who followed him and Kendrick later that night, and he testified that Walker was the shooter. Likewise, Kendrick identified Branch, Henderson, and Walker as the individuals who followed them on the night of the shooting. Kendrick also identified Walker as the shooter and testified that Henderson was the person who yelled "Web" or "Web Block" before the shooting.

Davis denied that she was present at the apartment during the shooting. She stated that she could not remember what she told investigators because she was drunk, emotional, and felt threatened. An investigator testified to her prior statements. Another investigator, a gang expert, provided evidence that Sex Cash was a criminal street gang;

---

3    After being charged with attempted murder as a codefendant of Branch, Henderson, and Walker, Davis pleaded guilty to being an accessory after the fact and admitted the crime was committed to benefit the Sex Cash gang.

that Branch, Henderson, and Walker were active members of that gang; and that the shooting was committed to benefit the gang.

Branch, Henderson, and Walker did not call any witnesses in their defense. At trial, their counsel highlighted potential inconsistencies and shortcomings in Jason's and Kendrick's identifications of the defendants. They also relied on Jason's and Kendrick's gang affiliations to argue their statements were unreliable.

DISCUSSION

I

Branch contends the trial court erred by not requiring the prosecution to accept Branch's proposed stipulation that Sex Cash was a criminal street gang under section 186.22, subdivision (f), and that Branch was a member of that gang.[4] Henderson and Walker joined in Branch's proposal in the trial court. Branch argues that the stipulation would have prevented the prosecution from introducing facts such as prior criminal acts by members of Sex Cash (including Henderson) to prove that Sex Cash was a criminal street gang.

"The general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness

---

4    Section 186.22, subdivision (f) provides as follows: "As used in this chapter, 'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."

7

and forcefulness."  (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1007 (*Edelbacher*); see *People v. Waidla* (2000) 22 Cal.4th 690, 723, fn. 5 (*Waidla*).)  "The prosecution [is] not obligated to present its case in the sanitized fashion suggested by the defense."  (*People v. Garceau* (1993) 6 Cal.4th 140, 182 (*Garceau*).)  "There is a strong policy against depriving the People's case of its persuasiveness and strength by forcing the prosecutor to accept stipulations that soften the impact of the evidence in its entirety.  [Citation.]  Thus, prosecutors are not required to stipulate to the existence of any elements of the crime they are trying to prove where the stipulation will impair the effectiveness of their case . . . ."  (*People v. Cajina* (2005) 127 Cal.App.4th 929, 933 (*Cajina*).)  The prosecution also may not be forced to accept a stipulation preventing the introduction of evidence where the probative value of the evidence goes beyond the scope of the stipulation.  (See *Garceau,* at p. 182; *People v. Hall* (1980) 28 Cal.3d 143, 152-153 (*Hall*).)

"The exception -- which we count on the trial courts to recognize and enforce -- is the instance in which the probative value of the evidence is substantially outweighed by its prejudicial effect.  (Evid. Code, § 352.)  These are among the most difficult and important decisions a trial court makes.  Even approached -- as they must be -- with great care, they tax every judge's reservoirs of common sense, fairness and circumspection.  Given the broad discretion reposed in them, their sense of justice will often be the last word on these issues, and -- obviously -- much rides on their decision."  (*People v. Thornton* (2000) 85 Cal.App.4th 44, 49.)

For example, the prosecution may be required to stipulate to the fact of a prior offense to prevent the details of that offense—which are otherwise irrelevant—from

being introduced into evidence.  (See, e.g., *Hall, supra*, 28 Cal.3d at pp. 152-153

[stipulation regarding prior felony conviction in prosecution for possession of a firearm

by a felon]; *Cajina, supra*, 127 Cal.App.4th at p. 934 [stipulation regarding prior sex

offense conviction in prosecution for failure to comply with sex offender registration

requirements].)[5]  The prosecution may also be required to stipulate to certain basic facts

regarding victims that, if presented through testimony, might inflame the passions of

jurors.  (See *People v. Bonin* (1989) 47 Cal.3d 808, 849 [holding that admission of

evidence from the victims' parents that "the victim was a human being and was alive

before the alleged criminal act was committed and was dead afterwards" in light of

defendants' offer to stipulate was error, albeit harmless].)  We review the trial court's

decision not to require the prosecution to accept a stipulation (and thus allowing evidence

covered by the stipulation to be admitted) for abuse of discretion.  (*Waidla, supra*, 22

Cal.4th at p. 723, fn. 5.)

Branch's proposed stipulation that Sex Cash was a criminal street gang and that

Branch was a member of that gang covered several of the elements of the offense of

active participation in a criminal street gang under section 186.22, subdivision (a).

Branch, however, pleaded not guilty to that offense and proceeded to trial by jury.

---

[5]     The Supreme Court in *Hall* also held that it was prejudicial for the jury to be informed of the fact of the prior felony conviction if the defendant stipulates to its existence.  (*Hall, supra*, 28 Cal.3d 143.)  *Hall* expressly limited its holding to a prosecution for possession of a firearm by a felon, however, and expressed no opinion regarding "any other section of the Penal Code."  (*Hall,* at p. 156; cf. *Cajina, supra*, 127 Cal.App.4th at p. 934 [holding that the fact of a prior sex offense conviction may not be withheld from the jury because the jury would otherwise be unable to understand the reason for the registration requirements the defendant is accused of violating].)

Branch's plea of not guilty required the prosecution to prove the elements of that offense beyond a reasonable doubt.  (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 400, fn. 4.) Branch's proposed stipulation, which would have the effect of limiting the prosecution's evidence on several elements of that offense solely to the stipulation, would have "deprive[d] the state's case of its persuasiveness and forcefulness" and was therefore properly refused by the trial court.  (See *Edelbacher, supra*, 47 Cal.3d at p. 1007; see also *People v. Scheid* (1997) 16 Cal.4th 1, 16.)

Branch's proposed stipulation also would have prevented the introduction of evidence that had probative value beyond the offense of active participation in a criminal street gang.  (See *Garceau, supra*, 6 Cal.4th at p. 182; *Hall, supra*, 28 Cal.3d at pp. 152-153.)  "The rule that the state cannot be restricted by stipulations in presenting its case is particularly compelling when the likely effect of a stipulation that removes certain matters from the trial is to hamper a coherent presentation of the remaining issues." (*Cajina, supra*, 127 Cal.App.4th at p. 933.)  As to each attempted murder charge, the prosecution alleged that Branch committed the offense in association with, or for the benefit of, a criminal street gang under section 186.22, subdivision (b).  The history, membership, symbols, and activities of Sex Cash were relevant to the jury's assessment of this enhancement.  They gave meaning to the facts surrounding the shooting and provided a basis on which to assess the relationship of the shooting to Sex Cash's own activities.  Branch's proposed stipulation would have significantly impacted the prosecution's ability to present evidence regarding this relationship.

Branch's contention that the "real issue" in the case was the identity of the perpetrators of the attempted murders, rather than their gang affiliation, is unpersuasive. By pleading not guilty to all of the charges, Branch put at issue not only the attempted murders but the gang participation offense and the gang enhancements. While the identity of the perpetrators was a critical issue, the other issues in the case were likewise "real issue[s]" that the prosecution was required to prove to the jury beyond a reasonable doubt.

The trial court here explicitly weighed the probative value of the challenged evidence against its prejudicial effect under Evidence Code, section 352, in light of Branch's proposed stipulation. The court found the evidence to be more probative than prejudicial: "[C]learly, there's probative value to it, again, to educate the jury as to how gang members may operate, why they may act the way that they do, what motivates them, all of those things are certainly relevant. . . . [I]t is evidence to be a foundation or a building block as to motivation of these individuals, if they did commit the crime, as to why they would. And it's different than it would be just in a normal sense where you have three people who may have shot at two others." The court did not abuse its discretion by refusing the stipulation and allowing the challenged evidence to be admitted. (See *Waidla, supra*, 22 Cal.4th at p. 723, fn. 5.)

II

A

Henderson contends his counsel was ineffective at trial by failing to object to the admission of Davis's statements to police while in custody. Henderson claims his

counsel should have objected because Davis was coerced during her police interrogation and his constitutional rights were violated by admission of her statements. (See, e.g., *People v. Williams* (2010) 49 Cal.4th 405, 452-453 (*Williams*).)

At trial, Davis testified that she was drunk and impaired by psychoactive medication during the interrogation. She was also emotionally affected by the fact that she was being interrogated in the same room where she had been questioned by police about her infant son, who had died exactly a year earlier. Davis testified that investigators told her she was facing attempted murder charges and a long time in prison.[6] Davis also testified that the investigators threatened to take her five-year-old daughter away from her. Davis said the investigators told her that her codefendants would try to blame her for the shooting.

Duke Viveros, one of the investigators, testified at trial and disputed Davis's account of the interrogation. Viveros testified that Davis was lucid and did not appear drunk or impaired. (She did, however, throw up once after the interview.) Viveros testified that he did not threaten Davis or tell her the government would take Davis's daughter away. Viveros told Davis only that the crimes she was facing were serious and that she could face significant prison time. Viveros said he told Davis to be honest with him.

---

6    In discussions outside the presence of the juries, the prosecution and defense counsel appear to agree that an investigator told Davis she was facing life imprisonment. The court ruled that Davis could not mention the specific term in her testimony in front of the juries.

12

"The standards for ineffective assistance of counsel claims are well established. 'We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions.' [Citation.] To establish a meritorious claim of ineffective assistance, defendant 'must establish either: (1) As a result of counsel's performance, the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown [citations] or (2) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors . . . or omissions, the trial would have resulted in a more favorable outcome.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 261 (*Prieto*).)

Henderson contends that the latter standard applies here. He bears the "difficult" burden of establishing ineffectiveness. (*People v. Lucas* (1995) 12 Cal.4th 415, 437.) "Judicial scrutiny of counsel's performance must be highly deferential." (*Strickland v. Washington* (1984) 466 U.S. 668, 689.) "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*Lucas,* at pp. 436-437.)

" 'A reviewing court will not second-guess trial counsel's reasonable tactical decisions.' " (*People v. Freeman* (1994) 8 Cal.4th 450, 484.) The decision at issue here, whether to object to the admission of Davis's statements to investigators, falls into this category. "Because the decision whether to object is inherently tactical, the failure to

13

object to evidence will seldom establish incompetence." (*Id.* at pp. 490-491.) " '[A]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel.' " (*People v. Avena* (1996) 13 Cal.4th 394, 421.)

"When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation' [citation], the contention must be rejected." (*People v. Jackson* (1989) 49 Cal.3d 1170, 1188 (*Jackson*).)

Here, as we will explain, the record demonstrates that reasonable counsel would have understood that an objection to Davis's statements on the ground she was coerced was unlikely to be successful. The decision not to pursue such an objection was therefore not unreasonable and did not constitute deficient performance. "It is well settled that counsel is not ineffective in failing to make an objection when the objection would have likely been overruled by the trial court." (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 924; see *People v. Mitcham* (1992) 1 Cal.4th 1027, 1080 ["[T]he rebuttal evidence was properly admitted, and counsel's failure to object might well have been based upon the reasonable assumption that an objection would be overruled. Counsel's failure to make a meritless objection does not constitute deficient performance."]; *Prieto, supra*, 30 Cal.4th at p. 261 ["[C]ounsel's decision to forgo implausible arguments or objections does not constitute deficient performance."].)

Henderson bore the burden at trial to demonstrate that Davis's statements were obtained as a result of improper coercion. "[W]hen a defendant seeks to exclude the allegedly involuntary testimony of a witness or codefendant, the *defendant* bears the burden of proving that the admitted statements were involuntar[ily] obtained [citation]." (*People v. Douglas* (1990) 50 Cal.3d 468, 500.) "The statement of a suspect or witness is coerced if it is the product of police conduct which overcomes the person's free will. '[T]he primary purpose of excluding coerced testimony of third parties is to assure the reliability of the trial proceedings. . . .' " (*People v. Lee* (2002) 95 Cal.App.4th 772, 782 (*Lee*), fns. omitted.)

After reviewing the record, we conclude that a reasonable attorney could find that Henderson was unlikely to carry his burden of establishing coercion. Any objection to Davis's testimony based on coercion would have been meritless. Davis's description of the interrogation does not include any deception, false statements, or other psychological manipulation by investigators. The investigators' descriptions of the charges Davis was facing and her potential punishment were accurate and factual. Davis was facing attempted murder charges, with gang enhancements, and life imprisonment. An investigator's factual description of the charges and potential punishment a suspect is facing falls well within the bounds of proper interrogation techniques. (See *People v. Boyer* (2006) 38 Cal.4th 412, 445.)

Davis testified she was intoxicated and impaired by psychoactive drugs. Viveros contradicted her on this point, testifying that she was lucid and did not appear drunk or impaired. Similarly, Viveros denied Davis's testimony that the investigators threatened to

15

take Davis's daughter away from her. Even though it was undisputed that Davis threw up after the interrogation, and child protective services visited Davis after the interrogation, these facts alone do not show coercion during the interrogation. Given the lack of credibility apparent from Davis's testimony, a reasonable attorney could determine that a claim of coercion under these circumstances would be meritless. Although Henderson claims on appeal that Viveros "admitted that he told Davis she had better incriminate the defendants before they placed the blame on her[,]" Viveros's testimony does not support such a claim. Viveros testified that he told Davis only to tell the truth and not to protect the defendants (because they would not protect her).

The cases finding coercion on which Henderson relies are inapposite. There is no evidence here that Viveros implicitly or explicitly conditioned any threats or promises on Davis giving statements that would incriminate Henderson or his codefendants. (Cf. *Lee, supra*, 95 Cal.App.4th at pp. 785-786 [finding unconstitutional coercion where police relied on deception to implicate a witness and threatened to charge the witness with first degree murder unless the witness named defendant as the killer].) Nor is there evidence Davis was subjected to gratuitous threats and descriptions of the death penalty. (Cf. *People v. Underwood* (1964) 61 Cal.2d 113, 124 (*Underwood*).)

"We may assume that counsel had knowledge of the legal principles involved and we cannot fault him for failing to make what would have been a fruitless objection." (*Jackson, supra*, 49 Cal.3d at p. 1189; see *People v. Price* (1991) 1 Cal.4th 324, 387 (*Price*).) Henderson's claim that his trial counsel was ineffective is therefore unpersuasive, as we have discussed. "Because there was no sound legal basis for

16

objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance." (*People v. Cudjo* (1993) 6 Cal.4th 585, 616; see *People v. Linton* (2013) 56 Cal.4th 1146, 1168; *People v. Anderson* (2001) 25 Cal.4th 543, 587.)

B

In a related argument, Henderson contends the court had a sua sponte duty to instruct the jury that they must determine whether Davis's statements were the result of coercion before relying upon them for any purpose. Henderson's contention presents a question of law, which we review de novo. (See *People v. Canizalez* (2011) 197 Cal.App.4th 832, 850; see also *People v. Guiuan* (1998) 18 Cal.4th 558, 569.) The jury here received pattern instructions allowing them to use Davis's pretrial statements during her interrogation as substantive evidence (see CALCRIM No. 318), subject to limitations based on her status as a potential accomplice (see CALCRIM No. 334). The jury also received a pattern instruction regarding the credibility of witnesses, which identified factors such as "bias or prejudice" and "a personal interest in how the case is decided" as relevant considerations. (See CALCRIM No. 226.) The jury did not receive any instructions specifically discussing coercion.

Henderson relies on *Underwood, supra*, 61 Cal.2d at page 125, which criticized jury instructions that did not account for a witness's coercion. As *Underwood* explained, "the jury was instructed *without qualification* that it was permissible to consider prior inconsistent statements of a witness for purposes of testing his credibility. Although this instruction is, of course, correct in the usual case [citation], it should not have been given

17

here without qualification in view of the evidence that [the witness's] prior statements were involuntary." (*Ibid.*)

While *Underwood* represented the law at the time of its decision, the subsequent enactment of the Evidence Code invests the trial court with the responsibility for determining the voluntariness of confessions and other statements. (See Evid. Code, §§ 400, 402, subd. (b), 405; see also *People v. Culver* (1973) 10 Cal.3d 542, 547, fn. 8 ["With the adoption of the Evidence Code, effective January 1, 1967, California now gives the trial judge the final responsibility for determining the admissibility of confessions . . . ."].) Our Supreme Court has therefore expressly rejected the claim that a trial court errs by not instructing the jury to determine the voluntariness of a defendant's confession. (*People v. Haydel* (1974) 12 Cal.3d 190, 203, fn. 7 (*Haydel*).)

While the statement at issue here was made by a third-party witness, rather than a confession by a defendant, the same analysis applies. The trial court, not the jury, must determine the admissibility of such a statement, including determining the preliminary fact of whether the statement was made as a result of coercion. (See Evid. Code, § 405, subd. (a).) The court was therefore under no duty to instruct the jury to determine the issue of voluntariness.

For the same reasons, Henderson's counsel was not ineffective by not requesting such an instruction. A reasonable attorney would have recognized that the court, not the jury, must decide the issue of voluntariness. (See *Haydel, supra*, 12 Cal.3d at p. 203, fn. 7; *Jackson, supra*, 49 Cal.3d at p. 1189 ["We may assume that counsel had knowledge of the legal principles involved . . . ."].) Henderson's counsel was not ineffective for not

18

making a futile request, contrary to law, that the jury make such a determination. (See *Price, supra*, 1 Cal.4th at p. 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile."]; see also *People v. Solomon* (2010) 49 Cal.4th 792, 843, fn. 24.)

C

Henderson next contends the court erred by declining to strike his prior serious and violent felony conviction under *Romero, supra*, 13 Cal.4th 497. " 'In *Romero*, [the Supreme Court] held that a trial court may strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony, on its own motion, "in furtherance of justice" pursuant to . . . section 1385[, subdivision] (a).' " (*People v. Carmony* (2004) 33 Cal.4th 367, 373 (*Carmony*).) "[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law . . . or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) "Thus, the [T]hree [S]trikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing

19

so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Carmony,* at p. 378.)

"[A] trial court's refusal or failure to dismiss or strike a prior conviction allegation under section 1385 is subject to review for abuse of discretion." (*Carmony, supra*, 33 Cal.4th at p. 375.) " 'This standard is *deferential*. [Citations.] But it is not empty.' " (*People v. Garcia* (1999) 20 Cal.4th 490, 503 (*Garcia*).) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citation.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citation.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony,* at pp. 376-377.)

Here, Henderson admitted suffering a prior conviction for robbery under section 211, which is a serious and violent felony for purposes of section 667, subdivisions (c) and (e)(1). Henderson also has a long criminal history, which the trial court characterized as "abhorrent," including burglaries, thefts, and various criminal offenses while housed in juvenile detention facilities. The circumstances of the current offenses are even more

serious.  While Henderson was not the shooter, he nonetheless aided and abetted the attempted murder of two teenagers as they walked past an apartment complex. Henderson did so for the benefit of his criminal street gang, Sex Cash, the largest gang in Moreno Valley.  While Henderson appears to have suffered from a difficult childhood, nothing about his experiences mitigates his conduct under the circumstances here.  The trial court was within its discretion to deny Henderson's request to strike his prior conviction.  (See *Carmony, supra*, 33 Cal.4th at p. 378.)

Henderson claims the trial court "gave undue emphasis to his criminal history and insufficient weight to his youth, his life circumstances, and the unduly harsh punishment for a crime which did not result in a killing and in which [Henderson] was not the shooter."  However, "[t]he court is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary.  [Citation.]  Thus, the fact that the court focused its explanatory comments on the violence and potential violence of appellant's crimes does not mean that it considered only that factor." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.)  Henderson's argument reflects at most a disagreement with the manner in which the trial court weighed the relevant factors, which is insufficient to show abuse of discretion.  (See *Carmony, supra*, 33 Cal.4th at pp. 376-377.)  We note Henderson has not shown that the trial court refused to consider a relevant factor or, alternatively, considered an impermissible factor in declining to dismiss.  (See *Carmony,* at p. 378.)

Henderson's reliance on *Garcia* is unpersuasive.  In that case, the Supreme Court affirmed a trial court's decision to strike five prior convictions as to one current felony.

21

(*Garcia, supra*, 20 Cal.4th at p. 503.) The trial court did not strike the prior convictions as to a more serious current felony. (*Ibid.*) The Supreme Court concluded that the trial court acted within its discretion in partially striking the prior convictions because, among other reasons, the resulting sentence remained lengthy (31 years 4 months to life imprisonment). (*Ibid.*) Because it affirmed a trial court's decision to *strike* a prior conviction, *Garcia* has little bearing on the issue presented here, i.e., whether the trial court abused its discretion in *declining* to strike a prior conviction allegation. *Garcia* does not stand for the proposition that a trial court abuses its discretion when it declines to dismiss a prior conviction allegation if the resulting sentence (considering the dismissal) would be lengthy, as Henderson implies. We therefore conclude the trial court did not err in denying Henderson's request to strike his prior conviction under *Romero*.

D

Henderson claims his sentence violates the prohibitions on cruel or unusual punishment in the federal and California Constitutions. (See U.S. Const. 8th Amend.; Cal. Const. art. 1, § 17.) "The Eighth Amendment to the United States Constitution applies to the states. [Citation.] It prohibits the infliction of 'cruel *and* unusual' punishment. (U.S. Const., 8th Amend., italics added.) Article I, section 17 of the California Constitution prohibits infliction of '[c]ruel *or* unusual' punishment. (Italics added.)" (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82 (*Palafox*).) Although Henderson "has technically forfeited the issue on appeal because he did not raise the objection below [citation], we 'shall reach the merits under the relevant constitutional

22

standards, in the interest of judicial economy and to prevent the inevitable ineffectiveness-of-counsel claim.' " (*People v. Russell* (2010) 187 Cal.App.4th 981, 993.)

The Eighth Amendment "contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing v. California* (2003) 538 U.S. 11, 20 (*Ewing*).)  The Eighth Amendment " 'does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Ewing,* at p. 23.)  Similarly, "a punishment may violate the California constitutional prohibition 'if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*).)  To make this determination under California law, courts assess " 'the nature of the offense and/or the offender,' " the "punishments prescribed by California law for more serious offenses," and the "punishments prescribed by other jurisdictions for the same offense." (*People v. Em* (2009) 171 Cal.App.4th 964, 972 (*Em*).)

"Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment." (*Palafox, supra*, 231 Cal.App.4th at p. 82.)  "We add that the determination of whether a legislatively prescribed punishment is constitutionally excessive is not a duty which the courts eagerly assume or lightly discharge.  Here, as in other contexts, ' "mere doubt does not afford sufficient reason for a judicial declaration of invalidity.  Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears." ' " (*In re Lynch* (1972) 8 Cal.3d 410, 414-415.)  Findings of

23

disproportionality are exceedingly rare, and they occur only in extraordinary cases. (*Lockyer v. Andrade* (2003) 538 U.S. 63, 73; *Em, supra*, 171 Cal.App.4th at p. 972.)

Henderson contends his punishment, an indeterminate term of 50 years to life imprisonment and a determinate term of 27 years 8 months, is grossly disproportionate. He focuses first on his relative youth (19 years) at the time of the offense. Youth is a consideration in the disproportionality analysis. (See *Dillon, supra*, 34 Cal.3d at p. 479 [identifying factors such as a defendant's "age, prior criminality, personal characteristics, and state of mind"].) Although recent case law has established categorical rules to be applied in the sentencing of juvenile offenders (see *Miller v. Alabama* (2012) __ U.S. __ [132 S.Ct. 2455]; *People v. Caballero* (2012) 55 Cal.4th 262), youth is not a determinative factor for nonjuvenile offenders like Henderson under either federal or California law. Instead, it must be considered in conjunction with other factors.

Reviewing these other factors, Henderson notes that he was an aider and abettor to the two attempted murders, rather than the actual shooter. Henderson also points out that his prior criminal offenses, though numerous, were mostly nonviolent. He argues that his sentence was grossly disproportionate in relationship to the sentences prescribed for other serious offenses, such as second degree murder under section 190 (15 years to life imprisonment), voluntary manslaughter under section 193 (up to 11 years), rape under section 264 (up to 8 years), and lewd acts on a minor under section 288 (up to 8 years). He claims "even a first degree murder conviction committed by the actual killer does not bring a sentence as severe as that imposed here."

24

Henderson has not shown his sentence violates the federal or California Constitutions. The fact that Henderson was an aider and abettor rather than the actual shooter is relevant but, again, it is not dispositive. The facts of the instant offense confirm Henderson's dangerousness and disregard for lives of others. Had Walker been a more accurate shot, Jason and Kendrick would have been killed. Henderson did nothing to prevent that result; instead, he actively encouraged it. Similarly, the fact that Henderson has a long criminal history—with one serious and violent felony conviction— makes a severe sentence all the more reasonable. (See *Ewing, supra*, 538 U.S. at pp. 25, 29; see also *Rummel v. Estelle* (1980) 445 U.S. 263, 284-285; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 570.) The fact that many of Henderson's offenses were nonviolent does not erase the effect of this history. Even the absence of a significant criminal record—which is not the case here—is not determinative in assessing the constitutionality of a given punishment. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 497.)

The various hypothetical punishments under the Penal Code that Henderson references also do not demonstrate gross disproportionality. As an initial matter, Henderson is incorrect that his sentence is more severe than that which would result from a first degree murder conviction. "[T]he maximum punishment for the hypothecated first degree murder includes the death penalty, which is more severe than defendant's sentence." (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1093 (*Haller*); see § 190, subd. (a).) The remaining punishments are for single counts and do not incorporate any gang- or firearms-related sentencing enhancements, as the jury found in Henderson's

25

case. They also do not account for enhanced sentencing for a prior serious and violent felony conviction, as Henderson admitted here.

Henderson's sentence is not one of the extraordinary and extremely rare cases where the sentence is grossly disproportionate to the offense. (See *Haller, supra*, 174 Cal.App.4th at pp. 1086, 1083 [upholding a sentence of 78 years to life imprisonment for convictions for assault with a deadly weapon, criminal threats, and stalking]; see also *Ewing, supra*, 538 U.S. at pp. 19-20, 28 [upholding sentence of 25 years to life for a conviction for felony grand theft with prior thefts and burglary]; *Harmelin v. Michigan* (1991) 501 U.S. 957, 1001, 1005 [upholding life sentence without parole for drug possession].) Henderson's sentence does not violate the federal or California Constitutions.

E

Henderson argues that the gang enhancements found by the jury under section 12022.53, subdivision (e), violate the constitutional guarantee of equal protection because that subdivision unjustifiably treats aiders and abettors in gang-related shootings more harshly than aiders and abettors in nongang-related shootings. He claims this distinction should be analyzed under strict scrutiny and, under that test, cannot be sustained.

"Under this sentencing regime an aider and abettor who is found guilty of murder is subject to the 25[-]year[-]to[-]life enhancement even though he or she did not personally and intentionally discharge a firearm causing death if the murder was committed for the benefit of a criminal street gang and 'any principal' in the offense personally and intentionally discharged a firearm causing death. In all other killings

26

subject to section 12022.53, subdivision (d)—that is, killings not for the benefit of a criminal street gang—a principal, including an aider and abettor, is only subject to the 25-year enhancement if he or she personally and intentionally discharged a firearm causing death." (*People v. Hernandez* (2005) 134 Cal.App.4th 474, 480 (*Hernandez*).)

Henderson's argument was considered and rejected by the court in *Hernandez*. In that case, the Court of Appeal for the Second Appellate District determined that the appropriate test for the challenged classification was rational basis review. (*Hernandez, supra*, 134 Cal.App.4th at p. 483.) Under this standard, *Hernandez* concluded that "the Legislature had a rational basis for imposing a 25-year[]-to-life enhancement on one who aids and abets a gang-related murder in which the perpetrator uses a gun, regardless of the relationship between the aider and abettor and the perpetrator. . . . [T]he purpose of this enhancement is to reduce through punishment and deterrence 'the serious threats posed to the citizens of California by gang members using firearms.' One way to accomplish this purpose is to punish equally with the perpetrator a person who, acting with knowledge of the perpetrator's criminal purpose, promotes, encourages or assists the perpetrator to commit the murder." (*Ibid.*, fn. omitted.)

Henderson argues that *Hernandez* was wrongly decided. "We, of course, are not bound by the decision of a sister Court of Appeal. [Citation.] But '[w]e respect stare decisis . . . which serves the important goals of stability in the law and predictability of decision. Thus, we ordinarily follow the decisions of other districts without good reason to disagree.' " (*The MEGA Life & Health Ins. Co. v. Superior Court* (2009) 172 Cal.App.4th 1522, 1529 (*MEGA Life*).)

27

Henderson claims *Hernandez* erred by applying the rational basis standard.

Relying on *People v. Olivas* (1976) 17 Cal.3d 236 (*Olivas*), Henderson contends the strict scrutiny standard applies here.  In *Olivas*, the Supreme Court considered a defendant's claim that his sentence as a juvenile offender violated equal protection principles because it was more severe than his sentence would be as an adult offender.  (*Id.* at pp. 242-243.)  The Supreme Court defined the interest at issue "to include not only his interest in being free from incarceration in an institution of the Youth Authority, but also to encompass his interest in freedom from the restraints that accompany parole or any other control by the authority."  (*Id.* at p. 245.)  The Supreme Court determined that this interest was "fundamental," such that strict scrutiny applied to the challenged classification.  (*Id.* at pp. 251, 250.)

*Olivas* has not been interpreted as broadly as Henderson urges.  As the Supreme Court explained in a later opinion, "The language in *Olivas* could be interpreted to require application of the strict scrutiny standard whenever one challenges upon equal protection grounds a penal statute or statutes that authorize different sentences for comparable crimes, because such statutes always implicate the right to 'personal liberty' of the affected individuals.  Nevertheless, *Olivas* properly has not been read so broadly." (*People v. Wilkinson* (2004) 33 Cal.4th 821, 837 (*Wilkinson*).)  In *Wilkinson*, the Supreme Court approvingly quoted a Court of Appeal opinion limiting *Olivas* to its particular facts:  " 'This language [in *Olivas*] requires only that the boundaries between the adult and juvenile criminal justice systems be rigorously maintained.  We do not read *Olivas* as requiring the courts to subject all criminal classifications to strict scrutiny requiring the

28

showing of a compelling state interest therefor.' " (*Wilkinson,* at pp. 837-838, quoting *People v. Davis* (1979) 92 Cal.App.3d 250, 258.)

*Wilkinson* held that the rational basis test applies to equal protection claims challenging different sentences for allegedly comparable crimes. (*Wilkinson, supra*, 33 Cal.4th at p. 838; see *People v. Turnage* (2012) 55 Cal.4th 62, 74.) "A defendant . . . 'does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives.' " (*Wilkinson,* at p. 838.) "Application of the strict scrutiny standard in this context would be incompatible with the broad discretion the Legislature traditionally has been understood to exercise in defining crimes and specifying punishment." (*Ibid.*)

Because the Supreme Court has held that the rational basis test applies to the equal protection claim at issue here and in *Hernandez*, Henderson's claim that *Hernandez* was wrongly decided is meritless.[7] We therefore follow *Hernandez* both as a matter of stare decisis (see *MEGA Life, supra*, 172 Cal.App.4th at p. 1529) and because we agree with its reasoning upholding the challenged classification under the rational basis test (see *Hernandez, supra*, 134 Cal.App.4th at p. 483). Application of section 12022.53, subdivision (e) does not violate the constitutional guarantee of equal protection under the circumstances here.

---

7      Henderson also relies on *People v. Wutzke* (2002) 28 Cal.4th 923, 943, for the proposition that strict scrutiny applies here. Our review of that opinion does not reveal any discussion of the level of scrutiny to be applied in this context. *People v. Nguyen* (1997) 54 Cal.App.4th 705, which Henderson also cites, was decided before the Supreme Court clarified its *Olivas* opinion in *Wilkinson*. It is therefore unpersuasive.

## III

## A

Walker contends the trial court prejudicially erred by admitting evidence of his confession during an interrogation by sheriff's deputies. Walker argues evidence of his confession should not have been admitted because (1) he invoked his Fifth Amendment right to an attorney during the interrogation, prior to his confession, and that invocation was not respected, in violation of *Miranda, supra*, 384 U.S. 436; and (2) his confession was not voluntary.

After his arrest, Walker was questioned by Robert Navarrette, a sheriff's deputy, while in custody at a sheriff's station. The interrogation was audiotaped. After some preliminary conversation, Navarrette read Walker his *Miranda* rights.[8] Walker did not ask for an attorney at that time and proceeded to answer Navarrette's questions. Walker denied any involvement in the shooting. After Navarrette implied he had evidence of Walker's involvement, and encouraged Walker to try "to help [himself] out here," Walker made the following statement: "Well (unintelligible). I will keep real as soon as you all (unintelligible) attempted murder charges. Take me to the hole. I'll go to court. And talk my lawyer or whatever. And then to get this over with. 'Cause I didn- I didn't - I wasn't there - like I told you. So, and you all ain't find no burner with me or nothing. All you all got is witnesses saying I probably did something and I didn't do shit. So what. So, that's what it is." Navarrette responded, "Okay. So when we talk to Old Boy over here

---

8    The prosecution did not offer the pre-*Miranda* preliminary conversation into evidence.

30

and - and he says you were with him, what he - what's he gonna say?  What's his reason to lie?"  Walker then said "Who?" and the conversation continued unabated.[9]

Walker continued to deny involvement in the shooting.  Navarrette encouraged Walker to cooperate.  He said, "And we can go to them and say, 'Look, this is what Jeremy told us.  And he's being cooperative.  And, you know, Jeremy made some mistakes.  You know, a bad - a bad place at the wrong time.'  Or whatever you wanna call it.  All right?  Wrong place at the wrong time.  And whatever somebody else did and got you caught up."  An unknown voice interrupted, and Navarrette continued: "Rather than them saying, 'Yeah, Jeremy fucking shot that boy.  Jeremy shot that guy (unintelligible)."  Walker continued to deny involvement.  Walker said, "You should just leave me.  I didn't do shit."  Navarrette responded, "Well, and I would if you cooperate."  Walker again denied involvement, and Navarrette told Walker he did not believe him.

After further questioning, Navarrette noticed Walker was getting upset:  "I know you're getting upset.  And it - and it's because, yeah, you're lives [*sic*] on the line.  You're right."  After Walker responds "Yeah," Navarrette continues:  "You know, and I can understand your frustration.  But you have an opportunity here - whatev- I don't care if you change your life or you just wanna go back to gangbanging or whatever.  And - it's fine.  You know what I mean?  You (unintelligible) a small case and do but a few years but - no, I - I would not wanna see you do it now."  After briefly discussing another case,

---

9     The text of the interrogation is drawn from a transcript prepared by the prosecution.  Diction, spelling, and punctuation are as in the original.  A " 'burner' " is slang for a gun.  (See *People v. Botello* (2010) 183 Cal.App.4th 1014, 1020.)

31

Navarrette said, "Like I said, with you, you have an opportunity right now. Yeah, you - you - to help yourself and then walk away from this. Somewhat. You know?"

Walker asked, "Walk away from gangbanging and stuff?" Navarrette responded, "Yeah. And I know you're not going to do that. And one day you'll find it - okay, you're gonna see . . . ." Walker and Navarrette discussed the possibility of Walker being labeled a snitch. Navarrette then said, "And you - you might avoid getting locked up or going prison or doing a lot of time but if you cooperate - but it - and I don't know what you . . . ." Walker then responded, "Okay. All right, bro, what you wanna know? What you wanna know?"

After that, Walker discussed the confrontation between Jason and Sex Cash members early on the day of the shooting. He admitted playing video games with Branch and Henderson later that day, when they heard Jason was walking through the apartment complex again. Walker and the others rushed to confront him, but Walker said someone else grabbed a gun and did the shooting. Walker and Navarrette discussed the circumstances of the shooting extensively, though Walker denied knowing who the shooter was. After further discussion, and after taking photographs of Walker's tattoos, Navarrette ended the interrogation.

The trial court rejected Walker's argument that his statement, "And talk [to] my lawyer or whatever," was an invocation of his right to counsel. The court determined the reference to a lawyer was "fleeting" and "certainly no request for a lawyer." The court also recognized that Walker did not stop talking after his reference to a lawyer and

continued to discuss the case. At most, the court determined, Walker's statement regarding a lawyer was ambiguous.

The court also rejected Walker's argument that he was coerced into confessing by an express or implied promise of leniency, e.g., Navarrette's statement that Walker "might avoid getting locked up or going [to] prison or doing a lot of time. . . ." Emphasizing that Navarrette phrased his statement conditionally (using the word "might"), the court found that there was not "a sufficient basis for any sort of cooperation having been promised and enticement . . . to speak; and, therefore, avoiding any voluntar[y] statement on his part." Walker's confession was therefore received into the evidence considered by his jury. It was not part of the evidence considered by Branch and Henderson's jury.

B

We first consider Walker's contention that he invoked his Fifth Amendment right to counsel during the interrogation by remarking "And talk [to] my lawyer or whatever" in the midst of a longer statement about the criminal justice process. "Under *Miranda* and its progeny, 'a suspect [may] not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel.' [Citation.] If at any point in the interview the suspect invokes the right to remain silent or the right to counsel, 'the interrogation must cease.' " (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104-1105 (*Bacon*).)

33

"Once the defendant has waived his or her right to counsel, . . . if the defendant has a change of heart, he or she must invoke the right to counsel *unambiguously* before the authorities are required to cease the questioning. [Citation.] The suspect must articulate sufficiently clearly his or her desire to have counsel present so that a reasonable officer in the circumstances would understand the statement to be a request for an attorney. [Citation.] '[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer *in light of the circumstances* would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.' " (*Williams, supra,* 49 Cal.4th at p. 432.)

For example, courts have determined that an invocation is insufficiently unambiguous where it is accompanied by qualifying words (*Davis v. United States* (1994) 512 U.S. 452, 462 (*Davis*) [" 'Maybe I should talk to a lawyer' "]; *Bacon, supra*, 50 Cal.4th at p. 1104 [" 'I think it'd probably be a good idea for me to get an attorney' "]); where the statement is conditional (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1126); or where the statement "constituted an expression of frustration and . . . game playing" (*Williams, supra*, 49 Cal.4th at p. 432).

"In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.] Because what defendant here said during his police interview is undisputed,

we engage in a de novo review of the legal question of whether the statement at issue was ambiguous or equivocal." (*Bacon, supra*, 50 Cal.4th at p. 1105.)

In light of these precedents, we conclude Walker did not unambiguously and unequivocally invoke his Fifth Amendment right to counsel and, therefore, law enforcement was not required to cease questioning him. The context surrounding Walker's statement shows that Walker was describing how he would beat any charges that he would face. He challenges the deputies to file attempted murder charges against him and "take [him] to the hole." He then says, "I'll go to court. And talk [to] my lawyer or whatever. And then to get this over with."

Considered as a whole, Walker's statement does not unambiguously request an attorney during the interview. Instead, Walker describes how he will talk to his lawyer once charges are filed and he appears in court. This interpretation is confirmed by the remainder of Walker's statement, in which he continues to talk about the case, deny involvement, and denigrate the potential evidence against him.

We therefore disagree with Walker's contention that his statement expressed his desire to end the interrogation and speak to an attorney. Walker's statement, taken as a whole, is an expression of bravado and a challenge to law enforcement. (See *Williams, supra*, 49 Cal.4th at p. 432.) Under these circumstances, a reasonable officer would not understand Walker's reference to a lawyer as an unambiguous request for counsel. The deputies were not required to cease interrogation, and Walker's *Miranda* claim is unavailing. (*Ibid.*)

Walker points out that a defendant is not required to use any particular words to invoke the right to counsel. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 129.) This principle concerns the *form* of a defendant's invocation, however, not its *substance*. "Although a suspect need not 'speak with the discrimination of an Oxford don,' . . . [citation], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* [*v. Arizona* (1981) 451 U.S. 477] does not require that the officers stop questioning the suspect." (*Davis, supra*, 512 U.S. at p. 459.) The substance of Walker's statement here was at most ambiguous, as we have explained.

C

Next we consider Walker's contention that he was coerced during his interrogation by express or implied promises of leniency and that his confession was therefore involuntary. " 'The Fourteenth Amendment to the federal Constitution and article I, section 15, of the state Constitution bar the prosecution from using a defendant's involuntary confession. [Citation.] . . . Under both state and federal law, courts apply a "totality of circumstances" test to determine the voluntariness of a confession. [Citations.] Among the factors to be considered are " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " [Citation.] On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial

36

evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 411 (*Boyette*).)

" 'In order to introduce a defendant's statement into evidence, the People must prove by a preponderance of the evidence that the statement was voluntary. [Citation.] . . . When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness.' " (*People v. Maury* (2003) 30 Cal.4th 342, 404.)

"In general, ' "any promise made by an officer or other person in authority, express or implied, of leniency or advantage to the accused, if it is a motivating cause of the confession, is sufficient to invalidate the confession and to make it involuntary and inadmissible as a matter of law." ' [Citation.] In identifying the circumstances under which this rule applies, [the Supreme Court has] made clear that investigating officers are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the accused speaks truthfully about the crime. [Citation.] The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." (*People v. Ray* (1996) 13 Cal.4th 313, 339 (*Ray*).)

"[T]he distinction between permissible and impermissible police conduct 'does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by the defendant if he speaks the truth as represented by the police.' " (*People v. Belmontes* (1988) 45 Cal.3d 744, 773.) "When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of

conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the forgoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear." (*People v. Hill* (1967) 66 Cal.2d 536, 549; see *People v. Holloway* (2004) 33 Cal.4th 96, 115.)

For example, in *People v. Jimenez* (1978) 21 Cal.3d 595 (*Jimenez*), the Supreme Court concluded a confession was involuntary, and therefore inadmissible, under the following circumstances: "The defendant testified and this testimony was corroborated by [the investigating officer] that the defendant was told he could get the death penalty, but that his codefendant probably would not. . . . By telling defendant that his codefendant probably would not get death, but that he might, [the investigating officer's] remarks carried with them the clear implication that by cooperating and telling what had actually happened, the defendant could possibly avoid getting a worse punishment than his codefendant because either the jury or court might treat him with leniency and not sentence him to death. As the uncontradicted evidence thus clearly indicates that defendant's confession was motivated by the benefits implied in [the investigating officer's] remarks, his confession must be deemed involuntary." (*Id.* at p. 613.) More recently, in *People v. Williams* (1997) 16 Cal.4th 635, the Supreme Court found a

promise of leniency under similar circumstances. In that case, the investigating officer "suggested, somewhat equivocally, that if defendant cooperated in the investigation the district attorney might not seek the death penalty." (*Id.* at p. 661.) The Supreme Court found this suggestion to be a promise of leniency, but it concluded the suggestion was not the motivating cause of the defendant's admissions. (*Ibid.*) Although these examples involve the death penalty, an express or implied promise of leniency need not involve that punishment in order to be found coercive. (See, e.g., *People v. Vasila* (1995) 38 Cal.App.4th 865, 875 (*Vasila*) [finding improper promises of leniency where investigators promised, in exchange for cooperation, not to institute federal prosecution for drug and weapons charges and to release defendant from custody until trial].)

Turning to Walker's confession, we are mindful of the circumstances of his interrogation, which are relevant to our consideration of voluntariness under the totality of the circumstances. (*Boyette, supra*, 29 Cal.4th at p. 411.) Walker's age at the time of the interrogation, 17 years, is among these circumstances. (*Ibid.*) From the transcript of the interrogation, Walker seems familiar with the criminal justice system. His maturity appears average for his age. Navarrette was an experienced interrogator, and the interrogation took place while Walker was in custody.

The crucial element here is Walker's claim of police coercion based on an express or implied promise of leniency. (See *Boyette, supra*, 29 Cal.4th at p. 411.) Throughout the interrogation, Navarrette explained the benefits of cooperating with police. Navarrette began by citing the general benefits that might naturally accrue if Walker were truthful, which is allowable under the law. (See *Ray, supra*, 13 Cal.4th at p. 340.) For

39

example, Navarrette explained he could tell "them" (presumably the district attorney) what Walker said during the interrogation and that Walker was being cooperative.

After Walker continued to deny involvement, however, Navarrette explained that Walker was facing attempted murder charges. Walker again denied involvement and began to get upset. Navarrette said, "I know you're getting upset. And it - and it's because, yeah, you're lives [*sic*] on the line. You're right." Soon afterwards, Navarrette offered Walker an opening: "And you - you might avoid getting locked up or going [to] prison or doing a lot of time but if you cooperate . . . ." Although the use of the word "but" in the transcript is unclear, the only reasonable interpretation of Navarrette's statement is that Walker might avoid going to prison or doing "a lot of time" if he cooperates with law enforcement. Already upset, Walker immediately assents: "Okay. All right, bro, what you wanna know? What you wanna know?"

Navarrette therefore offered Walker a choice: either face prosecution for attempted murder with his life "on the line" or cooperate with law enforcement and potentially avoid prison entirely. Because Navarrette offered Walker a benefit or advantage in exchange for his cooperation, rather than simply pointing out the natural advantages that might accrue, Navarrette's statement was an improper promise of leniency. Moreover, Walker's immediate assent after Navarrette's promise shows it was the motivating factor or cause for Walker's confession. (See *Vasila, supra*, 38 Cal.App.4th at pp. 876-877; *People v. Cahill* (1994) 22 Cal.App.4th 296, 316-317 (*Cahill*).) Prior to that assent, Walker denied all involvement. Afterwards, Walker admitted involvement in the shooting and explained its circumstances in detail. We

40

therefore conclude, on de novo review, that the prosecution did not meet its burden of showing that Walker's confession was voluntary.

Navarrette's use of the word "might" does not alter this analysis. Law enforcement need not promise that a particular outcome will certainly result if the defendant cooperates in order for the promise to be improper. (See *People v. Williams, supra*, 16 Cal.4th at p. 661 [finding promise where defendant was told "if defendant cooperated in the investigation the district attorney might not seek the death penalty"]; *Jimenez, supra*, 21 Cal.3d at p. 613 [finding promise where defendant was told he "could possibly avoid getting a worse punishment" if he cooperated]; *Cahill, supra*, 22 Cal.App.4th at pp. 314, 317; *People v. Flores* (1983) 144 Cal.App.3d 459, 471-472.) A chance at a better outcome, even if conditional, may still confer a sufficient benefit on the defendant to make his cooperation (and subsequent confession) involuntary. Here, for example, after being told his life was "on the line," Walker was given the chance to avoid prison entirely—but only if he cooperated. The coercive effect of Navarrette's promise is apparent, especially given Walker's age and the circumstances of his interrogation.

Because Walker's confession was involuntary, its admission violated Walker's rights under the federal and California Constitutions. His conviction must therefore be reversed unless the People can show that the error in admitting the confession was harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 295; *People v. Neal* (2003) 31 Cal.4th 63, 86 (*Neal*).) This standard requires the People to prove " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] 'To say that an error did not contribute to the ensuing

41

verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is 'whether the . . . verdict actually rendered in *this* trial was surely unattributable to the error.' " (*Neal,* at p. 86.)

"[C]onfessions, 'as a class,' '[a]lmost invariably' will provide persuasive evidence of a defendant's guilt [citation], and . . . such confessions often operate 'as a kind of evidentiary bombshell which shatters the defense[.]' " (*People v. Cahill* (1993) 5 Cal.4th 478, 503.) "[T]he improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial . . . ." (*Ibid.*) "[A]lthough the erroneous admission of a confession might be harmless in a particular case, it nevertheless is 'likely to be prejudicial in many cases.' " (*Neal, supra*, 31 Cal.4th at p. 86.)

The People have not shown the admission of Walker's confession was harmless beyond a reasonable doubt. Aside from his confession, the only evidence tying Walker to the crime were (1) the eyewitness accounts of Jason and Kendrick, (2) blue clothing recovered from his residence that was consistent with certain accounts by Jason and Kendrick, and (3) the gun recovered from Davis's apartment that Walker sometimes visited. While the testimony of "numerous, disinterested reliable eyewitnesses to the crime" may in some cases be sufficient to overcome the erroneous admission of a confession, when combined with "a wealth of uncontroverted physical evidence," the evidence in this case fell far short of that standard. (See *Neal, supra*, 31 Cal.4th at p. 86.)

42

The record shows that Jason and Kendrick were not completely reliable eyewitnesses. Although Jason identified Walker as the shooter, his testimony was inconsistent regarding the appearance of the shooter and the clothing he wore. At the preliminary hearing and at trial, Jason denied at times that Walker was the shooter or said he was not sure. At one point during trial, Jason testified that he was 85 percent sure that Walker was the shooter, but then he testified that he was 75 percent sure someone else (not Walker, Branch, or Henderson) was the shooter. Similarly, although Kendrick was more confident that Walker was the shooter, Kendrick was initially unable to identify Walker at all during the preliminary hearing. Jason's and Kendrick's credibility was also impaired by their gang affiliations and their criminal records; Kendrick testified under a grant of immunity. The physical evidence, clothes recovered from Walker's residence and the gun recovered from Davis's apartment, also does not strongly point to Walker's guilt. Based on Jason's conflicting descriptions, the clothes recovered from Walker's residence were not necessarily consistent with the crime, and there was no evidence to tie Walker specifically to the gun.

The prosecution told the jury they could simply "toss[] the rest of the evidence" because "it's not even a close call," in the prosecution's view, that Walker was at least guilty of aiding and abetting the shooting in light of his confession. The prosecution's reliance on Walker's erroneously admitted confession increases the potential for prejudice here. (*People v. Powell* (1967) 67 Cal.2d 32, 55-57; *People v. Diaz* (2014) 227 Cal.App.4th 362, 384.) "There is no reason why we should treat this evidence as any less

43

'crucial' than the prosecutor -- and so presumably the jury -- treated it." (*People v. Cruz* (1964) 61 Cal.2d 861, 868.)

Indeed, the jury's deliberations show that the case against Walker was not overwhelming even with his confession. The jury deliberated for approximately nine hours over two days. (See *People v. Rucker* (1980) 26 Cal.3d 368, 391 [jury deliberation for nine hours demonstrates a close case; prejudicial error found].) Significantly, the jury requested a recorder so that they could listen to Walker's confession again during deliberations. The importance the jury placed on it is evident.[10]

The Attorney General points out that Walker confessed only to taking part in the shooting, not being the shooter himself. While the jury's verdict therefore went beyond the admitted acts in Walker's confession, the verdict does not show that Walker's confession was inconsequential. As we have discussed, it contributed greatly to the weight of the evidence against Walker and likely resolved doubts that might have arisen from inconsistencies in the other evidence.

Similarly, the fact that Branch and Henderson were convicted of similar charges related to the shooting does not show that admission of Walker's confession was harmless beyond a reasonable doubt. In assessing harmless error, our focus is on the trial Walker received, the state of the evidence against him, and the deliberations of his jury. Branch and Henderson's convictions show only that a jury could convict a defendant based on the evidence against them; not that a jury will always do so beyond a reasonable doubt.

---

[10]     The jury also requested that Jason's testimony be read back during deliberations.

44

Moreover, Branch and Henderson were tied to the shooting by additional evidence that did not implicate Walker: (1) Davis's statement that they returned to the apartment soon after the shooting sweating profusely, and (2) the gun found in the apartment where they both stayed and where they were detained at the time the gun was found. Walker was also convicted of more serious charges than Branch or Henderson, including a finding that the attempted murders were willful, deliberate, and premeditated and a finding that Walker personally discharged a firearm. Any comparisons are therefore inapt.

Under the circumstances of this case, we cannot say that the People have proved that the erroneous admission of Walker's confession was harmless beyond a reasonable doubt. Walker's convictions must therefore be reversed. Because Walker's confession was admitted only against him, and was not heard by the jury of Branch and Henderson, their convictions are unaffected by the error.

DISPOSITION

The judgments against Daquan Rashad Branch and Caleb Marquan Henderson are affirmed. The judgment against Jeremy Walker is reversed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

45